1   Daniel A. Sasse (State Bar No. 236234)
    dsasse@crowell.com
2   Deborah E. Arbabi (State Bar No. 167275)
    darbabi@crowell.com
3   John S. Gibson (State Bar No. 140647)
    jgibson@crowell.com
4   Jordan L. Ludwig (State Bar No. 277952)
    jludwig@crowell.com
5   CROWELL & MORING LLP
    3 Park Plaza, 20th Floor
6   Irvine, California 92614-8505
    Telephone: (949) 263-8400
7   Facsimile: (949) 263-8414

8   Attorneys for All Plaintiffs

9

                    UNITED STATES DISTRICT COURT
10
                   NORTHERN DISTRICT OF CALIFORNIA
11

12   Accor Management US Inc.; Accor Hotels          Case No. 19-4188
     & Resorts (Maryland) LLC; Fairmont Hotel
13   Management L.P.; Auro Hotels                     **COMPLAINT FOR VIOLATIONS OF:**
     Management, LLC; AutoNation, Inc.; BJ's
14   Restaurants, Inc.; Bridgestone Americas,         **SECTIONS 1 AND 2 OF THE SHERMAN
     Inc.; Bridgestone Americas Tire Operations,      ANTITRUST ACT; THE CALIFORNIA
15   LLC; Bridgestone Retail Operations, LLC;         CARTWRIGHT ACT (CAL. BUS. &
     Caleres, Inc.; CarMax, Inc.; Concord             PROF. CODE §§ 16700 ET SEQ.); AND
16   Hospitality Enterprises Company, LLC; The        THE CALIFORNIA UNFAIR
     Container Store, Inc.; Crestline Hotels &        COMPETITION LAW (CAL. BUS. &
17   Resorts, LLC; DIRECTV, LLC; AT&T                 PROF CODE §§ 17200 ET SEQ.)
     Services, Inc.; AT&T Corp.; AT&T
18   Mobility LLC; AT&T Mobility II, LLC;             **DEMAND FOR JURY TRIAL**
     BellSouth Telecommunications LLC;
19   Cricket Wireless LLC; DC Comics; E.C.
     Publications, Inc.; HBO Digital Services,
20   Inc.; HBO Retail Ventures, Inc.;
     Telepictures Productions Inc.; Warner
21   Brothers Advanced Media Services Inc.;
     Warner Bros. Consumer Products Inc.;
22   Warner Bros. Digital Networks Labs Inc.;
     Warner Bros. Entertainment, Inc.; Warner
23   Bros. Home Entertainment Inc.; WB Games
     Boston Inc.; WB Studio Enterprises Inc.;
24   Enterprise Holdings, Inc.; Fitness
     International, LLC; Flynn Restaurant
25   Group LP; Gordon Brothers Group, LLC;
     Heart of America Management, L.L.C.;
26   Hilton Worldwide Holdings, Inc.; Host
     Hotels & Resorts, L.P.; HSN, Inc.;
27   Cornerstone Brands, Inc.; Hyatt Hotels
     Corporation; Ingram Micro Inc.; Interstate
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1  Hotels & Resorts, Inc.; Jack in the Box Inc.;
   Joshi Hotel Group, LLC; Kaiser Foundation
2  Health Plan, Inc.; Kaiser Foundation
   Hospitals; LEGO Systems, Inc.; LEGO
3  Brand Retail, Inc.; Loews Hotels Holding
   Corporation; Mananto Enterprises LLC;
4  Marriott International, Inc.; Marriott
   Vacations Worldwide Corporation;
5  Mountain Standard Group, LLC; National
   General Holdings Corp.; National General
6  Management Corp.; Nespresso USA, Inc.;
   Nestle Waters North America Inc.; Old
7  Comp Inc.; OnStar, LLC; Pacifica Hotel
   Management, LLC; Public Storage; Qdoba
8  Restaurant Corporation; Sage Hospitality
   Resources LLC; Sage Investment Holdings,
9  L.L.C.; Sephora USA, Inc.; Sunstone Hotel
   Investors, Inc.; United Airlines, Inc.;
10 UnitedHealth Group Incorporated; and
   White Lodging Services Corporation,

11              Plaintiffs,

12    v.

13 Visa Inc.; Visa U.S.A., Inc.; Visa
   International Service Association;
14 MasterCard Incorporated; and MasterCard
   International Incorporated,

15

16             Defendants.

17

18

19     Plaintiffs Accor Management US Inc.; Accor Hotels & Resorts (Maryland) LLC,

20  Fairmont Hotel Management L.P. (collectively, "Accor"); Auro Hotels Management, LLC

21  ("Auro") AutoNation, Inc. ("AutoNation"); BJ's Restaurants, Inc. ("BJ's"); Bridgestone

22  Americas, Inc., Bridgestone Americas Tire Operations, LLC, Bridgestone Retail Operations, LLC

23  (collectively, "Bridgestone"); Caleres, Inc. ("Caleres"); CarMax, Inc. ("CarMax"); Concord

24  Hospitality Enterprises Company, LLC ("Concord"); The Container Store, Inc. ("The Container

25  Store"); Crestline Hotels & Resorts, LLC ("Crestline"); DIRECTV, LLC, AT&T Services, Inc.,

26  AT&T Corp., AT&T Mobility LLC, AT&T Mobility II, LLC, BellSouth Telecommunications

27  LLC, Cricket Wireless LLC, DC Comics, E.C. Publications, Inc., HBO Digital Services, Inc.,

28  HBO Retail Ventures, Inc., Telepictures Productions Inc., Warner Brothers Advanced Media

Services Inc., Warner Bros. Consumer Products Inc., Warner Bros. Digital Networks Labs Inc., Warner Bros. Entertainment, Inc., Warner Bros. Home Entertainment Inc., WB Games Boston Inc., WB Studio Enterprises Inc., (collectively, "AT&T"); Enterprise Holdings, Inc. ("Enterprise"); Fitness International, LLC ("LA Fitness"); Flynn Restaurant Group LP ("Flynn"); Gordon Brothers Group, LLC ("Gordon Brothers"); Heart of America Management, L.L.C. ("Heart of America"); Hilton Worldwide Holdings, Inc. ("Hilton"); HSN, Inc. and Cornerstone Brands, Inc. ("HSN"); Host Hotels & Resorts, L.P. ("Host Hotels"); Hyatt Hotels Corporation ("Hyatt"); Ingram Micro Inc. ("Ingram Micro"); Interstate Hotels & Resorts, Inc. ("Interstate"); Jack in the Box Inc. ("Jack in the Box"); Joshi Hotel Group, LLC ("JHG"); Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (collectively, "KFHP/H"); LEGO Systems, Inc. and LEGO Brand Retail, Inc. (collectively, "LEGO"); Loews Hotels Holding Corporation ("Loews"); Mananto Enterprises  LLC ("Mananto Enterprises"); Marriott International, Inc. ("Marriott"); Marriott Vacations Worldwide Corporation ("Marriott Vacations Worldwide"); Mountain Standard Group, LLC ("Yarrow"); National General Holdings Corp and National General Management Corp. ("National General Insurance"); Nespresso USA, Inc. ("Nespresso"); Nestle Waters North America Inc. ("Nestle Waters"); Old Comp Inc. ("CompUSA"); OnStar, LLC ("OnStar"); Pacifica Hotel Management, LLC ("Pacifica"); Public Storage; Qdoba Restaurant Corporation ("Qdoba"); Sage Hospitality Resources LLC and Sage Investment Holdings, L.L.C. ("Sage"); Sephora USA, Inc. ("Sephora"); Sunstone Hotel Investors, Inc. ("Sunstone"); United Airlines, Inc. ("United"); UnitedHealth Group Incorporated ("UnitedHealth"); and White Lodging Services Corporation ("White Lodging") (altogether, "Plaintiffs") for their Complaint against Defendants Visa, Inc.; Visa U.S.A., Inc.; Visa International Service Association (collectively, "Visa"); MasterCard Incorporated; and MasterCard International Incorporated (collectively, "MasterCard") allege as follows:

## INTRODUCTION

### *The Price-Fixing Conspiracies*

1.      Visa and MasterCard, the two preeminent global payment card networks, have each entered into *per se* unlawful horizontal combinations and conspiracies with their respective

affiliate banks to fix the price of fees paid to the banks by Plaintiffs and other merchants and to prevent competition for credit and debit card network services. Each Defendant has participated in these combinations and agreements that violate Section 1 of the Sherman Act, 15 U.S.C. § 1. Each combination is comprised of the overwhelming majority of banks or financial institutions that are competitors in the issuance of credit and debit cards in the United States. The majority of the banks and financial institutions that are affiliates of Visa are also affiliates of MasterCard and the majority of MasterCard affiliate banks are also affiliates of Visa. Most of these institutions issue both Visa-branded and MasterCard-branded credit and debit cards. These issuing banks and financial institutions are independently owned and managed and issue credit and debit cards to consumers, but have uniformly agreed and adhered to identical competitive restraints that have eliminated a wide-range of competition. In the absence of the competitive restraints, they would compete for their cards' acceptance by merchants in a variety of ways, for example, by offering lower interchange fee rates and other financial incentives, as well as better and more innovative services. However, Visa and its affiliate banks have agreed not to compete with each other for merchant acceptance of the credit and debit cards that those affiliate banks issue, and MasterCard and its affiliate banks have agreed not to compete with each other for merchant acceptance of the credit and debit cards that those affiliate banks issue, as enshrined in Visa and MasterCard's respective rules. The Defendants' rules eliminate all competition in the marketplace and thus protect the supracompetitive interchange fees they set.

2.      Visa and MasterCard, unlike American Express, operate as "open-loop" systems. Each Defendant is only one of multiple parties involved in the processing of each payment card transaction. Issuing banks issue payment cards to cardholders and provide those cardholders with credit. Acquiring banks are responsible for signing merchants up to accept Visa and MasterCard-branded payment cards. When a cardholder makes a purchase with a payment card, transaction information flows from the merchant, through the acquiring bank, over the Visa or MasterCard network, to the cardholder's issuing bank. The issuing bank then transfers the transaction amount—after deducting its fee—from the cardholder's account, over the network, to the acquiring bank, which pays the merchant the net amount of the transactions after subtracting any

remaining fees.  In an "open-loop" system, the issuing banks, networks, and acquiring banks are separate entities, in contrast to "closed-loop" systems such as American Express, where one company plays all three roles in a vertically integrated system.  Despite being separate competitive entities, however, the issuing and acquiring banks in the "open-loop" system at issue here are also Visa and MasterCard "affiliate banks" that can serve as either the issuing or acquiring bank, and are typically either the issuing or acquiring bank in any given transaction.  In addition to acting as network service providers facilitating transactions, Visa and MasterCard serve as mechanisms for fixing prices and otherwise limiting competition for the affiliate banks.

3.      Defendants set prices for and regulate two general types of payment cards: credit cards and debit cards.  Credit cardholders may generally either pay their balance by the end of each billing period, or pay only part of the balance and pay interest to the issuing bank on the remaining amount.  Debit cards are linked to a cardholder's demand account, allowing the cardholder to withdraw money directly from the account to complete a transaction with a merchant.

4.      Issuing banks earn income on credit cards from interchange fees assessed to merchants and on interest paid on cardholders' account balances.  They also earn income on fees and charges to the cardholder, including annual fees, and fees and penalties for late payment on card balances.  Banks benefit from debit cards from the use of funds deposited in cardholders' accounts to cover debit card purchases, the reduced cost of processing transactions compared to processing cash and checks, and various fees associated with cardholders' accounts.

5.      Issuing banks extract a significant amount of fees on credit and debit card use through fees charged to merchants.  The most substantial portion of these fees by far is the interchange fee.  Visa and its affiliate banks, and MasterCard and its affiliate banks, have agreed upon a uniform schedule of interchange fees for all affiliate banks.  The two networks' interchange fee schedules are purposefully and knowingly set to increase in sync.  The Defendants' rules ensure that no affiliate will attempt to compete with others by undercutting the interchange fee rates agreed upon, and Visa and MasterCard both actively ensure that each time a merchant accepts a customer's Visa or MasterCard-branded card as a means of payment, the

1   agreed-upon interchange fee is charged.  That is so regardless of the identity of the issuing bank.

2   An interchange fee for each credit or debit card transaction is paid by the merchant to the card's

3   issuing bank and to the card network.  The issuing banks make greater revenue as the size and

4   frequency of debit or credit card transactions increases.

5   ***Operation of the Competitive Restraints***

6          6.      Visa and MasterCard have adopted nearly identical rules or "Competitive

7   Restraints" that were designed and agreed to by Visa and its affiliate banks, and MasterCard and

8   its affiliate banks, as a means to eliminate competition for merchant use of network services and

9   protect supracompetitive interchange and other fees.  The Competitive Restraints are enforced by

10  the Defendants.

11         7.      The principal rules that constitute the Competitive Restraints include: the setting of

12  "default" interchange fees, the Honor All Cards Rules, the All Outlets Rules, the No Discount and

13  Anti-Steering Rules, and the No Surcharge Rules.

14         8.      The Competitive Restraints imposed by Visa and MasterCard, and agreed upon by

15  the affiliate banks, protect their card issuing affiliates from having to compete for merchant

16  acceptance of their cards.  In doing so, the Competitive Restraints deprive merchants and

17  consumers of the benefits—in terms of lower fees, more favorable terms, innovation, and

18  differentiated services—that they would realize if there was competition among issuing banks for

19  merchants' acceptance of those banks' credit and debit cards.  For instance, Visa and MasterCard

20  have for many years forced issuers to use and merchants to accept outdated magnetic strip

21  technology in place of available and superior technology that would better protect merchants and

22  cardholders against fraud.  Defendants have recently forced a mass migration to "EMV chip"

23  technology ("EMV" is named for the three companies which created it, Europay, MasterCard,

24  and Visa) by a certain deadline that effectively shifts liability for fraud onto the merchants, but

25  have imposed their own proprietary technology and a less secure chip-and-signature system in

26  place of readily available chip-and-PIN technology that would dramatically reduce fraud.  In the

27  scramble and disarray that ensued to meet this deadline, Visa and MasterCard ensured that their

28  own proprietary EMV, which does not require the use of PIN authentication, became the new

industry standard.  The only reason they have done so is to protect their market power and supracompetitive profits.

### *Elimination of Competition, Resulting in Supracompetitive Prices*

9.    Because nearly all issuing banks in the United States are affiliates of Visa and MasterCard, and because those banks, through Visa and MasterCard, have agreed not to compete for merchant use of their services, Visa, MasterCard, and their affiliates enjoy market power in the markets for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services in the United States.  Defendants' market power allows them to fix interchange fees at supracompetitive levels and to continually raise those fees without merchants responding by refusing to accept Visa or MasterCard-branded cards or by switching to other payment cards.

10.    But for the Competitive Restraints, issuing banks would be free to compete with one another and negotiate bilateral agreements with merchants, seeking to undercut their competitors' interchange fees or to offer additional value to merchants.  Visa and MasterCard claim that such bilateral negotiations and agreements are possible, referring to their fixed schedules as "default" interchange fees that they claim can be modified.  However, the Competitive Restraints prevent such negotiations from ever happening.  The Honor All Cards Rules, for instance, require merchants that accept one Visa or MasterCard-branded card to accept all such cards, eliminating any incentive the merchant might have to negotiate a separate deal with any one issuer.  The No Discount and Anti-Steering Rules, No Surcharge Rules, and other rules prevent merchants from informing customers of the actual costs of each payment card and encouraging customers to use less expensive cards.  Beyond eliminating any reason to compete for merchant acceptance by offering lower interchange fees, Visa and MasterCard actually monitor every transaction and ensure that the "default" interchange fee is charged, threatening affiliate banks with fines and even expulsion if it is not charged.

11.    As a consequence of the practices described above, Plaintiffs have paid and continue to pay significantly higher interchange and other fees to accept Visa-branded and MasterCard-branded credit and debit cards than they would pay if the banks issuing those cards

competed with one another for Plaintiffs' use of their network services, as they would have the incentive to do absent the Competitive Restraints.

### *Previous Attempts to Stop Defendants' Anticompetitive Conduct and Effects*

12.    This is not the first time a merchant has resisted Visa and MasterCard's illegal agreements in court.  In 2003, the Second Circuit declared the exclusivity rules of both combinations, which prohibited affiliate banks from issuing competing cards on American Express or Discover networks, unlawful.  In that same year, in a class action settlement, Visa and MasterCard agreed to cease using the Honor All Cards Rules to tie debit card acceptance to credit card acceptance.  Those actions did not diminish Visa and MasterCard's power to set prices and prevent competition.  Immediately after those actions, both combinations increased the credit card interchange fees their affiliates charged to merchants.  The Federal Reserve Board subsequently found that the debit card interchange fees imposed after these judicial actions were significantly above cost.

13.    In response to a U.S. Department of Justice investigation in 2008, Visa withdrew its rule limiting merchants' ability to accept PIN debit cards.  Two years later, in a settlement with the Department of Justice, Visa and MasterCard both amended their rules to allow merchants to offer discounts to consumers in broader circumstances than previously allowed.  However, these changes did not diminish the combinations' market power or lead to a reduction in interchange fees paid by merchants.  Instead, interchange fees continued to increase.

14.    In 2011, the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. 1693o-2, mandated that the Federal Reserve Board set a maximum level of interchange fees that large banks could levy on some debit card transactions.  The Durbin Amendment also eliminated any distinction in interchange fees between signature debit transactions (which carried interchange rates comparable to credit interchange rates) and PIN debit transactions.  The maximum fee was set significantly below the then-existing interchange fee levels set by Visa and MasterCard for debit card transactions, and there was no prohibition on setting debit or credit interchange fees below this maximum fee level.  However,

1  the Federal Reserve Board limits did not apply to approximately one-third of debit cards, such as

2  those issued by smaller, non-regulated banks.  Neither did it apply to credit cards.

3  ***Defendants' Anticompetitive Conduct and Effects Continue***

4        15.    Defendants' Competitive Restraints and fixed "default" interchange fee schedules

5  have no procompetitive purpose and serve only to enrich Visa, MasterCard, and their affiliates in

6  a way that would not be possible were the markets for credit and debit card acceptance

7  competitive.  In fact, during a May 2013 earnings call, Visa CEO Charles W. Scharf admitted:

8  "[T]he reality is I think if you go around and talk to most issuers, they would probably say that

9  there wasn't a lot of conversation that went on between issuing and acquiring side, partially

10  because our rules that stood in the way of [issuing banks] working together to do something

11  positive for the merchant."

12        16.    Moreover, Visa and its affiliates use their monopoly power in the General Purpose

13  Debit Card Network Services market to suppress competition and thereby support their charging

14  of supracompetitive debit card interchange fees, which, likewise, harm merchants and cardholders

15  while greatly enriching themselves.

16        17.    Plaintiffs pay hundreds of millions of dollars in credit and debit interchange fees

17  each year to Visa, MasterCard, and their affiliate banks.  Indeed, interchange fees are one of

18  Plaintiffs' largest operating expenses.  Elimination of Defendants' price fixing scheme and

19  Competitive Restraints and the restoration of competitive markets for merchant use of payment

20  card network services would substantially reduce interchange fees, allowing Plaintiffs to operate

21  more efficiently and at lower cost.  Reduction in Plaintiffs' costs would also benefit Plaintiffs'

22  customers, including but not limited to Visa and MasterCard cardholders.

23                                   **JURISDICTION AND VENUE**

24        18.    The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal

25  question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), because this action arises

26  under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).  This complaint is filed under

27  Section 4 of the Clayton Act (15 U.S.C. § 1) and Section 16 of the Clayton Act (15 U.S.C. § 26),

28  and prays for treble damages, costs, including attorneys' fees, and an injunction to prevent and/or

restrain violations of Sections 1 and 2 of the Sherman Act.  The use of credit cards and debit cards issued by affiliate banks of Visa and MasterCard and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

19.    The Court has supplemental jurisdiction over the state law claims alleged herein under 28 U.S.C. § 1367.

20.    Venue is proper in the United States District Court for the Northern District of California under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15 and 22.  Defendants reside in, are found in, have agents in, and/or transact business in this District as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

21.    This Court has personal jurisdiction over Defendants because, *inter alia*, they: (a) transacted business throughout the United States, including in this District, (b) had substantial contacts with the United States, including in this District, and/or (c) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  Thousands of merchants located in this District accept Visa and/or MasterCard credit cards and debit cards issued by one or more affiliate banks.  A substantial part of interstate trade and commerce is involved and affected by the alleged violations of the antitrust laws, including within this District.  Accordingly, the illegal acts alleged here have had and will have substantial anticompetitive effects in this District.

**DEFINITIONS**

22.    For the purposes of this Complaint, the following definitions apply.

23.    "General Purpose Credit Cards" are payment cards that enable the cardholder to purchase goods or services from any merchant that has an agreement to accept such cards.  The credit cards at issue here are general purpose payment cards, as distinguished from private label cards, which can only be used at a single merchant.  When a cardholder makes a purchase with a credit card over the Visa or MasterCard network, the card's issuing bank first deducts the purchase amount from the cardholder's account, deducts the interchange fee from that purchase amount, and then transmits the remaining amount to the acquiring bank.  The acquiring bank then

transmits that amount, less other fees (collectively known, with the interchange fee, as the "merchant discount") to the merchant.  Credit cards enable a cardholder to obtain goods or services from a merchant on credit provided by the card issuer.  Cardholders may generally either pay their balance by the end of each billing period, or pay only part of the balance and pay interest to the issuing bank on the remaining amount.  Credit card issuers provide cardholders different terms and types of cards, which vary in the type and amount of rewards they provide cardholders.  Cards with a higher level of rewards are often referred to as "premium" cards and carry higher interchange fees.  Such cards afford no additional benefits to merchants that have to pass along these additional costs to all of their customers and impose hidden fees on cardholders who may not realize that the higher costs to merchants are passed on to them in the costs of goods and services.  General Purpose Credit Cards also include charge cards, which work in much the same manner as credit cards, but require the cardholder to pay his or her full balance at the end of each billing period.

24.    "General Purpose Credit Card Network Services" means the services and infrastructure that a network and its affiliates provide to merchants through which payment transactions using General Purpose Credit Cards are conducted, including authorization, clearance, and settlement.

25.    "General Purpose Debit Cards" are payment cards that allow account holders to pay for goods or services from any merchant that has an agreement to accept such cards, or to obtain cash by directly accessing their accounts.  Pre-paid cards are a type of General Purpose Debit Card.  There are two methods of authenticating debit cards.  PIN debit card transactions require the cardholder to enter a four-digit personal identification number (PIN) to authenticate the cardholder and are transacted over PIN debit networks, including those owned by Defendants (e.g., Interlink and Maestro) and independent networks (e.g., NYCE and Star).  Signature or offline debit card transactions usually require the cardholder's signature at the time of the transaction and are transacted over Visa and MasterCard's networks alone.  For many years, PIN debit transactions had no interchange fees or were subject to reverse interchange, where the merchant received a fee for card acceptance.  Debit cards were and are valuable enough to the

banks that it made sense to pay merchants to accept them.  Signature debit cards carried much higher interchange fees, some of which equaled the interchange fees charged for credit card transactions.

26.    Visa and MasterCard used their market power to drive transactions away from PIN debit to signature debit and to institute and raise interchange fees on PIN debit.  In 2011, pursuant to the Durbin Amendment to the Dodd-Frank Act, the Federal Reserve Board investigated the reasonableness of debit card fees and set the maximum interchange fee for regulated issuers' cards (both PIN and signature) at $0.21 plus 0.05% of the transaction amount (plus an additional $0.01 for fraud prevention for eligible issuers), or an average of $0.23–0.24 per debit transaction. In contrast, the signature debit interchange fees previously set by Visa and MasterCard averaged $0.58 and $0.59 per transaction, respectively, for the same issuers.

27.    "General Purpose Debit Card Network Services" means the services and infrastructure that a network and its affiliates provide to merchants through which payment transactions using General Purpose Debit Cards are conducted, including authorization, clearance, and settlement.

28.    An "issuing bank" is a Visa or MasterCard affiliate bank that issues general purpose credit or debit cards to cardholders.  The majority of issuing banks are affiliates of both Visa and MasterCard.  Issuing banks issue cards to cardholders and encourage the use of their cards by cardholders.  Because of the Competitive Restraints, they do not compete with one another for merchant acceptance of their cards.

29.    An "acquiring bank" is an affiliate of Visa or MasterCard that acquires purchase transactions from merchants.  All acquiring banks are affiliates of Visa and MasterCard.  As affiliate banks, acquiring banks act as gatekeepers, ensuring that card transactions are routed over the Visa or MasterCard networks, that interchange fees set by Visa and MasterCard are paid by merchants on all transactions, and that merchants abide by the rules imposed by Visa and MasterCard.

30.    An "interchange fee" is the fee that merchants pay to issuing banks and the card networks each time they accept a customer's credit or debit card issued by a Visa or MasterCard

affiliate bank.  Under the agreements by and among Visa, MasterCard, and their affiliate banks, the so-called "default" interchange fees are set by Visa and MasterCard and imposed uniformly on merchants that accept Defendants' cards.

31.    "Merchant discount" is the term used to describe the total amount of fees and other costs deducted from the original transaction amount by Visa, MasterCard, and their affiliate banks, which make up a merchant's incremental cost of acceptance.  The merchant discount includes the interchange fees merchants must pay to the issuing banks and card networks.

## THE PARTIES

### *Plaintiffs*

32.    Plaintiff Accor Management US Inc. is a Delaware corporation with its principal place of business in Maryland.  Plaintiff Accor Hotels & Resorts (Maryland) LLC is a Maryland limited liability company with its principal place of business in Maryland.  Plaintiff Fairmont Hotel Management L.P. is a Delaware limited partnership with its principal place of business in New York, New York.  Accor is one of the world's largest hotel groups, consisting of 33 brands in over one hundred countries, including in the United States.  Accor's brands include Fairmont, Swissotel, Sofitel, Pullman, Ibis, and Novotel.  Accor brings this lawsuit on behalf of all Accor-branded hotels, including all hotels that it owned, managed, and franchised at any time during the relevant time period, except as described below.  Such properties are set forth, to the best of Accor's current knowledge, on Exhibit A1, but may be amended upon discovery of further information.   Any exclusions from the present complaint are listed on Exhibit A2, which also contains information to the best of Accor's current knowledge, but may be amended upon discovery of further information.  Accor accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, Accor has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  Accor has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

33.    Plaintiff Auro Hotels Management, LLC is a South Carolina limited liability company headquartered in Greenville, South Carolina.  Auro is one of the largest privately owned hospitality companies in the country.  Its portfolio includes 30 hotels in the United States. Auro manages Hilton, Hyatt, and Marriott-branded hotels, among others.  Auro brings this lawsuit on behalf of the properties listed on Exhibit B.  This exhibit contains information to the best of Auro's current knowledge, but may be amended upon discovery of further information.  Auro accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, Auro has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  Auro has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

34.    Plaintiff AutoNation, Inc. is a Delaware corporation with its principal place of business in Fort Lauderdale, Florida.  AutoNation is the largest automotive retailer in the United States.  It owns approximately 325 total vehicle dealerships, collision centers, and vehicle auctions across 16 states.  AutoNation brings this action on behalf of itself and any and all of its subsidiaries.  AutoNation accepts both Visa and MasterCard debit and credit cards for payment at its locations. Accordingly, AutoNation has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  AutoNation has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

35.    Plaintiff BJ's Restaurants, Inc. is a California corporation with its principal place of business in Huntington Beach, California.  BJ's owns and operates over 200 casual restaurants across 27 states—several that include in-house brewing facilities for BJ's award-winning beer. Bottles and cans of BJ's beer are available to purchase at select BJ's locations.  BJ's accepts both Visa and MasterCard debit and credit cards for payment at its restaurants. Accordingly, BJ's has

been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  BJ's has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

36.     Plaintiff Bridgestone Americas, Inc. is a Nevada corporation with its principal place of business in Nashville, Tennessee.  Plaintiff Bridgestone Americas Tire Operations, LLC is a Delaware limited liability company with its principal place of business in Nashville, Tennessee.  Plaintiff Bridgestone Retail Operations, LLC is a Delaware limited liability company with its principal place of business in Nashville, Tennessee.  The Bridgestone group is the world's largest manufacturer of tire and rubber products.  Bridgestone provides tires and tire tubes for passenger cars, trucks, buses, motorcycles, construction and mining vehicles, industrial machinery, agricultural machinery, and aircraft.  Bridgestone's tire operations extend across a wide range of fields, from raw material production, retreading materials and services, and automotive maintenance and repair services.  Bridgestone also makes and sells a range of rubber and other products such as actuators and isolators, assembly machine bladders and sleeves, fiber, textiles, and rubber lining.  The Bridgestone family of enterprises includes more than 50 production facilities and 55,000 employees throughout the Americas.  Bridgestone accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, Bridgestone has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  Bridgestone has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

37.     Plaintiff Caleres, Inc. is a New York corporation with its principal place of business in St. Louis, Missouri.  Caleres is a diverse portfolio of global footwear brands, including Famous Footwear, Sam Edelman, Naturalizer, Allen Edmonds, Vionic, and Dr. Scholl's Shoes.  Caleres operates over 1,200 retail locations for its footwear brands throughout the world,

and also branded websites where shoes can be purchased. Caleres accepts both Visa and MasterCard debit and credit cards for payment. Accordingly, Caleres has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped. Caleres has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

38.    Plaintiff CarMax, Inc. is a Virginia corporation with its principal place of business in Richmond, Virginia. CarMax is the nation's largest retailer of used cars, selling over 740,000 used vehicles at retail during the latest fiscal year and operating over 200 used car stores in over 100 U.S. television markets. CarMax is also one of the nation's largest operators of wholesale vehicle auctions and is a provider of used vehicle financing. CarMax accepts both Visa and MasterCard debit and credit cards for payment. Accordingly, CarMax has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped. CarMax has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

39.    Plaintiff Concord Hospitality Enterprises Company, LLC is a Delaware limited liability company with its principal place of business in Raleigh, North Carolina. Concord develops and manages hotels across the United States and Canada. Its portfolio includes over 100 hotels of a variety of brands including Marriott, Hilton, and Hyatt, among others. Concord brings this lawsuit on behalf of Concord-managed hotels as set forth in Exhibit C that are not otherwise represented by the hotel brands. This exhibit contains information to the best of Concord's current knowledge, but may be amended upon discovery of further information. Concord accepts both Visa and MasterCard debit and credit cards for payment at the hotels that it manages. Accordingly, Concord has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful

1   conduct throughout the damages period and will continue to be subjected to such harm until

2   Defendants' anticompetitive conduct is stopped.  Concord has therefore been injured, and

3   continues to be injured, in its business and property as a result of the unlawful conduct alleged

4   herein.

5           40.     Plaintiff The Container Store, Inc. is a Texas corporation with its principal place of

6   business in Coppell, Texas.  The Container Store is the original and leading specialty retailer of

7   storage and organization products and solutions in the United States.  It operates over 90 retail

8   stores in 33 states and the District of Columbia, and a fully-integrated retail website.  The

9   Container Store accepts both Visa and MasterCard debit and credit cards for payment.

10  Accordingly, The Container Store has been forced to pay Defendants' supracompetitive

11  interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and

12  other unlawful conduct throughout the damages period and will continue to be subjected to such

13  harm until Defendants' anticompetitive conduct is stopped.  The Container Store has therefore

14  been injured, and continues to be injured, in its business and property as a result of the unlawful

15  conduct alleged herein.

16          41.     Plaintiff Crestline Hotels & Resorts, LLC is a Delaware limited liability company

17  with its principal place of business in Fairfax, Virginia.  Crestline is one of the nation's largest

18  independent hospitality and hotel management companies.  Its portfolio includes approximately

19  118 hotels in 27 states and the District of Columbia.  It manages Hilton, Hyatt, and Marriott-

20  branded hotels, among others.   Crestline brings this lawsuit on behalf of the properties listed on

21  Exhibit D.  This exhibit contains information to the best of Crestline's current knowledge, but

22  may be amended upon discovery of further information.  Crestline accepts both Visa and

23  MasterCard debit and credit cards for payment at the hotels that it manages.  Accordingly,

24  Crestline has been forced to pay Defendants' supracompetitive interchange fees and has suffered

25  the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct

26  throughout the damages period and will continue to be subjected to such harm until Defendants'

27  anticompetitive conduct is stopped.  Crestline has therefore been injured, and continues to be

28  injured, in its business and property as a result of the unlawful conduct alleged herein.

42.    Plaintiff DIRECTV, LLC is a California limited liability company with its principal place of business in El Segundo, California.  Plaintiff AT&T Services, Inc. is a Delaware corporation with its principal place of business in Dallas, Texas.  Plaintiff AT&T Corp. is a New York corporation with its principal place of business in Bedminster, New Jersey.  Plaintiff AT&T Mobility LLC is a Delaware limited liability company with its principal place of business in Atlanta, Georgia.  Plaintiff AT&T Mobility II, LLC is a Delaware limited liability company with its principal place of business in Atlanta, Georgia.  Plaintiff BellSouth Telecommunications, LLC is a Georgia limited liability company with its principal place of business in Atlanta, Georgia.  Plaintiff Cricket Wireless LLC, is a Delaware limited liability company with its principal place of business in Atlanta, Georgia.  Cricket Wireless brings this lawsuit as the successor in interest to Cricket Communications, Inc.  Plaintiff DC Comics is a New York general partnership with its principal place of business in Burbank, California.  Plaintiff E.C. Publications, Inc. is a Delaware corporation with its principal place of business in Burbank, California.  Plaintiff HBO Digital Services, Inc. is a Delaware corporation with its principal place of business in New York, New York.  Plaintiff HBO Retail Ventures, Inc. is a Delaware corporation with its principal place of business in New York, New York.  Plaintiff Telepictures Productions Inc. is a Delaware corporation with its principal place of business in Burbank, California.  Plaintiff Warner Brothers Advanced Media Services Inc. is a Delaware corporation with its principal place of business in Burbank, California.  Plaintiff Warner Bros. Consumer Products Inc. is a Delaware corporation with its principal place of business in Burbank, California.  Plaintiff Warner Bros. Digital Networks Labs Inc. is a Delaware corporation with its principal place of business in New York, New York.  Plaintiff Warner Bros. Entertainment, Inc. is a Delaware corporation with its principal place of business in Burbank, California.  Plaintiff Warner Bros. Home Entertainment Inc. is a Delaware corporation with its principal place of business in Burbank, California.  Plaintiff WB Games Boston Inc. is a Delaware corporation with its principal place of business in Needham, Massachusetts.  Plaintiff WB Studio Enterprises Inc. is a Delaware corporation with its principal place of business in Burbank, California.  Collectively, AT&T is one of the world's largest integrated communications companies,

1   providing high speed internet, mobile telephone and data services, traditional long distance and

2   local telephone service, cable and satellite television, to customers nationwide.  In addition,

3   AT&T, through its WarnerMedia division, develops, produces, and distributes premier film,

4   television, and gaming content, consumer products, offers studio rental, retail, tour, and food

5   services, and subscription video-on-demand, among other products and services.  AT&T accepts

6   both Visa and MasterCard debit and credit cards for payment in its retail stores and for telephone,

7   online, and recurring automatic payments. Accordingly, AT&T has been forced to pay

8   Defendants' supracompetitive interchange fees and has suffered the effects of Defendants'

9   unlawful Competitive Restraints and other unlawful conduct throughout the damages period and

10  will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.

11  AT&T has therefore been injured, and continues to be injured, in its business and property as a

12  result of the unlawful conduct alleged herein.

13      43.    Plaintiff Enterprise Holdings, Inc. is a Missouri corporation with its principal place

14  of business in St. Louis, Missouri.  Enterprise operates—through an integrated global network of

15  independent regional subsidiaries and franchises—the Enterprise Rent-A-Car, Alamo Rent A Car

16  and National Car Rental brands, as well as more than 9,600 fully staffed neighborhood and airport

17  locations in more than 90 countries.  Enterprise accepts both Visa and MasterCard debit and

18  credit cards for payment.  Accordingly, Enterprise has been forced to pay Defendants'

19  supracompetitive interchange fees and has suffered the effects of Defendants' unlawful

20  Competitive Restraints and other unlawful conduct throughout the damages period and will

21  continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.

22  Enterprise has therefore been injured, and continues to be injured, in its business and property as

23  a result of the unlawful conduct alleged herein.

24      44.    Plaintiff Fitness International, LLC is a California limited liability company with

25  its principal place of business in Irvine, California.  LA Fitness owns and operates over 700

26  health and fitness clubs across the U.S. and Canada with state of the art exercise equipment and

27  offers physical fitness services ranging from personal training to group fitness classes.  LA

28  Fitness also sells apparel for men and ladies and other merchandise through its online store.  LA

1    Fitness accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, LA

2    Fitness has been forced to pay Defendants' supracompetitive interchange fees and has suffered

3    the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct

4    throughout the damages period and will continue to be subjected to such harm until Defendants'

5    anticompetitive conduct is stopped.  LA Fitness has therefore been injured, and continues to be

6    injured, in its business and property as a result of the unlawful conduct alleged herein.

7        45.    Plaintiff Flynn Restaurant Group LP is a Delaware limited partnership

8    headquartered in San Francisco, California.  Flynn is the largest restaurant franchise group, and

9    one of the 20 largest foodservice companies of any kind, in the United States.  Flynn owns over

10    460 Applebee's, 270 Taco Bells, 130 Panera cafes, and 360 Arby's across 34 states.  Flynn

11    accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, Flynn has

12    been forced to pay Defendants' supracompetitive interchange fees, has suffered the effects of

13    Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages

14    period, and will continue to be subjected to such harm until Defendants' anticompetitive conduct

15    is stopped.  Flynn has therefore been injured, and continues to be injured, in its business and

16    property as a result of the unlawful conduct alleged herein.

17        46.    Plaintiff Gordon Brothers Group, LLC is a Delaware limited liability company

18    headquartered in Boston, Massachusetts.  Gordon Brothers brings this claim as the successor in

19    interest of the claims in this case of: (1) The Bombay Company, Inc. (and several of its affiliates),

20    whose claims Gordon Brothers acquired on November 21, 2016; (2) Michigan Sporting Goods

21    Distributors, Inc., whose claims Gordon Brothers acquired on August 30, 2017; and (3) NSC

22    Wholesale Holdings LLC (and several of its affiliates), whose claims Gordon Brothers acquired

23    on June 19, 2019.

24        a.    The Bombay Company, Inc. ("Bombay") is a furniture and home

25    accessories retailer that, at times relevant to the complaint, had over 500 retail stores, as well as

26    an online retail presence.  Bombay accepted both Visa and MasterCard debit and credit cards for

27    payment at its stores and on its website.  Accordingly, Bombay was forced to pay Defendants'

28    supracompetitive interchange fees and has suffered the effects of Defendants' unlawful

1    Competitive Restraints and other unlawful conduct throughout the damages period.  Bombay was

2    therefore injured in its business and property as a result of the unlawful conduct alleged herein.

3                b.        Michigan Sporting Goods Distributors, Inc. ("MC Sports") was a sporting

4    goods retailer that operated over 75 stores in the Midwestern United States.  MC Sports ceased

5    operations in 2017 after filing for bankruptcy.  MC Sports accepted both Visa and MasterCard

6    debit and credit cards for payment at its stores and on its website.  Accordingly, MC Sports was

7    forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of

8    Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages

9    period.  MC Sports was therefore injured in its business and property as a result of the unlawful

10   conduct alleged herein.

11               c.        NSC Wholesale Holdings, LLC ("National Wholesale Liquidators") was an

12   operator of warehouse-style discount stores that sold a wide array of items.  National Wholesale

13   Liquidators operated approximately 50 stores, most of them in the Northeast.  National Wholesale

14   Liquidators accepted both Visa and MasterCard debit and credit cards for payment at its stores

15   and on its website.  Accordingly, National Wholesale Liquidators was forced to pay Defendants'

16   supracompetitive interchange fees and has suffered the effects of Defendants' unlawful

17   Competitive Restraints and other unlawful conduct throughout the damages period.  National

18   Wholesale Liquidators was therefore injured in its business and property as a result of the

19   unlawful conduct alleged herein.

20       47.        Plaintiff Heart of America Management, L.L.C. is an Iowa limited liability

21   company headquartered in Moline, Illinois.  Heart of America operates 17 hotels and 23

22   restaurants across the Midwest.  Heart of America manages Hilton- and Marriott-branded hotels,

23   among others.  Heart of America brings this lawsuit on behalf of the properties listed on Exhibit

24   E.  This exhibit contains information to the best of Heart of America's current knowledge, but

25   may be amended upon discovery of further information.  Heart of America accepts both Visa and

26   MasterCard debit and credit cards for payment.  Accordingly, Heart of America has been forced

27   to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants'

28   unlawful Competitive Restraints and other unlawful conduct throughout the damages period and

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT; DEMAND FOR JURY TRIAL;
CASE NO. 19-4188

1    will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.

2    Heart of America has therefore been injured, and continues to be injured, in its business and

3    property as a result of the unlawful conduct alleged herein.

4         48.    Plaintiff Hilton Worldwide Holdings, Inc. is a Delaware corporation with its

5    principal place of business in McLean, Virginia.  Hilton is one of the largest hospitality

6    companies in the world, with approximately 5,685 properties in 113 countries.  Its hotel brand

7    portfolio includes Waldorf Astoria Hotels & Resorts, Hilton Hotels & Resorts, DoubleTree by

8    Hilton, Embassy Suites by Hilton, and Hilton Garden Inn, among others.  Approximately 4,562 of

9    Hilton's hotels are located in the United States.  Hilton brings this lawsuit on behalf of all Hilton-

10   branded hotels, including all hotels that it owned, managed, and franchised at any time during the

11   relevant time period, except as described below.  Such properties are set forth, to the best of

12   Hilton's current knowledge, on Exhibit F1, but may be amended upon discovery of further

13   information.   Any exclusions from the present complaint are listed on Exhibit F2, which also

14   contains information to the best of Hilton's current knowledge, but may be amended upon

15   discovery of further information.  Hilton accepts both Visa and MasterCard debit and credit cards

16   for payment.  Accordingly, Hilton has been forced to pay Defendants' supracompetitive

17   interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and

18   other unlawful conduct throughout the damages period and will continue to be subjected to such

19   harm until Defendants' anticompetitive conduct is stopped.  Hilton has therefore been injured,

20   and continues to be injured, in its business and property as a result of the unlawful conduct

21   alleged herein.

22        49.    Plaintiff Host Hotels & Resorts, L.P. is a Delaware limited partnership with its

23   principal place of business in Bethesda, Maryland.  Host Hotels owns luxury and upscale hotels.

24   Its portfolio includes Hilton, Hyatt and Marriott-branded hotels, among others.  Host Hotels

25   brings this lawsuit on behalf of the properties listed on Exhibit G.  This exhibit contains

26   information to the best of Host Hotel's current knowledge, but may be amended upon discovery

27   of further information.  Host Hotels accepts both Visa and MasterCard debit and credit cards for

28   payment.  Accordingly, Host Hotels has been forced to pay Defendants' supracompetitive

interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  Host Hotels has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

50.     Plaintiff HSN, Inc. is a Delaware corporation with its principal place of business in St. Petersburg, Florida.  Plaintiff Cornerstone Brands, Inc. ("Cornerstone") is a Delaware corporation with its principal place of business in West Chester, Ohio.  HSN is an interactive multi-channel retailer offering an assortment of exclusive products and top brand names to its customers through various platforms, including television, online, mobile, catalogs, and in retail and outlet stores.  The HSN television networks reach nearly 100 million residential households.  HSN accepts both Visa and MasterCard debit and credit cards for payment.  Cornerstone is composed of four home, apparel, and lifestyle brands, including Ballard Designs, Frontgate, Grandin Road, and Garnet Hill.  Cornerstone operates e-commerce websites for each of these brands and has several retail and outlet stores.  Accordingly, HSN has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  HSN has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

51.     Plaintiff Hyatt Hotels Corporation is a Delaware corporation with its principal place of business in Chicago, Illinois.  Hyatt is a leading global hospitality company, with a global portfolio consisting of approximately 843 hotels in 60 countries.  Hyatt operates under several brands, including Park Hyatt, Hyatt Regency, Hyatt, Andaz, and Hyatt Place, among others.  Approximately 62% of the rooms in Hyatt's hotel system are in the United States, which constitutes approximately 81% of its revenues.  Hyatt brings this lawsuit on behalf of all Hyatt-branded hotels, including all hotels that it owned, managed, and franchised at any time during the relevant time period, except as described below.  Such properties are set forth, to the best of

Hyatt's current knowledge, on Exhibit H1, but may be amended upon discovery of further information.   Any exclusions from the present complaint are listed on Exhibit H2, which also contains information to the best of Hyatt's current knowledge, but may be amended upon discovery of further information.  Hyatt accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, Hyatt has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  Hyatt has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

52.     Plaintiff Ingram Micro Inc. is a Delaware corporation with its principal place of business in Irvine, California.  Ingram Micro is one of the largest wholesale technology distributors in the world, with sales in 160 countries, operations in 64 countries, and maintaining 198 logistics centers and service centers throughout the world.  Among other things, it handles the distribution of one out of every three mobile devices in the United States.  Ingram Micro accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, Ingram Micro has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  Ingram Micro has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

53.     Plaintiff Interstate Hotels & Resorts, Inc. is a Delaware corporation headquartered in Arlington, Virginia.  Interstate is a leading third-party hotel management company that operates properties in 39 states and the District of Columbia.  Interstate manages Hilton, Hyatt, and Marriott-branded hotels, among others.  Interstate brings this lawsuit on behalf of the properties listed on Exhibit I.  This exhibit contains information to the best of Interstate's current knowledge, but may be amended upon discovery of further information.  Interstate accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, Interstate has been forced

to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped. Interstate has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

54.     Plaintiff Jack in the Box Inc. is a Delaware corporation with its principal place of business in San Diego, California.  Jack in the Box operates and franchises quick-service restaurants, and was the first major hamburger chain to develop and expand the concept of drive-thru restaurants.  It operates or franchises approximately 2,237 quick-service restaurants in 21 states and Guam.  Jack in the Box accepts both Visa and MasterCard debit and credit cards for payment at its restaurants.  Accordingly, Jack in the Box has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  Jack in the Box has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.  Jack in the Box seeks recovery for the restaurants that it owned and operated at any time during the relevant period, as set forth and listed on Exhibit J.  This exhibit contains information to the best of Jack in the Box's current knowledge, but may be amended upon discovery of further information.

55.     Plaintiff Joshi Hotel Group, LLC is a Pennsylvania limited liability company headquartered in Allentown, Pennsylvania.  JHG is one of the fastest growing hotel management companies in the Northeast Pennsylvania region.  It manages Hilton and Marriott-branded hotels, among others.  JHG brings this lawsuit on behalf of the properties listed on Exhibit K.  This exhibit contains information to the best of JHG's current knowledge, but may be amended upon discovery of further information.  JHG accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, JHG has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such

harm until Defendants' anticompetitive conduct is stopped. JHG has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

56.    Plaintiff Kaiser Foundation Health Plan, Inc. is a California nonprofit public benefit corporation with its principal place of business in Oakland, California. Plaintiff Kaiser Foundation Hospitals is a California nonprofit public benefit corporation with its principal place of business in Oakland, California. Kaiser Foundation Health Plan is one of the largest health maintenance organizations in the United States with approximately 12.3 million members. Kaiser Foundation Hospitals owns and operates 39 hospitals and 696 medical offices. KFHP/H operates in eight states and the District of Columbia. KFHP/H accepts both Visa and MasterCard debit and credit cards for payment at its retail stores and website. Accordingly, KFHP/H has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped. KFHP/H has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

57.    Plaintiff LEGO Systems, Inc. is a Connecticut corporation with its principal place of business in Enfield, Connecticut. Plaintiff LEGO Brand Retail, Inc. is a Connecticut corporation with its principal place of business in Enfield, Connecticut. LEGO is a toy production company that manufactures the iconic LEGO brick. LEGO operates approximately 91 retail locations in the United States across 35 states and an online retail website. LEGO accepts both Visa and MasterCard debit and credit cards for payment at its retail stores and website. Accordingly, LEGO has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped. LEGO has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

58.     Plaintiff Loews Hotels Holding Corporation is a Delaware corporation with its principal place of business in New York, New York.  Loews owns, operates, or manages a chain of approximately 25 luxury hotels under the Loews brand, most of which are in the United States. Loews brings this lawsuit on behalf of the properties listed on Exhibit L.  This exhibit contains information to the best of Loews's current knowledge, but may be amended upon discovery of further information.  Loews accepts both Visa and MasterCard debit and credit cards for payment. Accordingly, Loews has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  Loews has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

59.     Plaintiff Mananto Enterprises, LLC is a Massachusetts limited liability company with its principal place of business in Northampton, Massachusetts.  Mananto Enterprises operates an historic full service lifestyle hotel, offering 106 elegantly furnished guestrooms and luxury suites.  Mananto Enterprises accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, Mananto Enterprises has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped. Mananto Enterprises has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

60.     Plaintiff Marriott International, Inc. is a Delaware corporation with its principal place of business in Bethesda, Maryland.  Marriott is a worldwide operator, franchisor, and licensor of hotel, residential, and timeshare properties under numerous brand names, including Marriott, The Ritz-Carlton, W Hotels, Sheraton, Courtyard, and many others.  It is currently the largest hotel chain in the world, with more than 7,000 properties across 131 countries, over 5,100 of which are in the United States.  Marriott brings this lawsuit on behalf of all Marriott-branded hotels, including all hotels that it owned, managed, and franchised at any time during the relevant

time period, except as described below.  Such properties are set forth, to the best of Marriott's current knowledge, on Exhibit M1, but may be amended upon discovery of further information.  Any exclusions from the present complaint are listed on Exhibit M2, which also contains information to the best of Marriott's current knowledge, but may be amended upon discovery of further information.  These exhibits contain information to the best of Marriott's current knowledge, but may be amended upon discovery of further information.   Marriott accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, Marriott has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  Marriott has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

61.    Plaintiff Marriott Vacations Worldwide Corporation is a Delaware corporation with its principal place of business in Orlando, Florida.  Marriott Vacations Worldwide is a global company that offers vacation ownership, exchange, and rental, resort, and property management.  Its vacation ownership segment consists of more than 100 resorts and over 660,000 owners and members.  Marriott Vacations Worldwide's exchange & third-party management segment includes exchange networks and membership programs comprised of more than 3,200 resorts in over 80 nations and nearly two million members, as well as management of more than 180 additional resorts and lodging properties.  Marriott Vacations Worldwide brings this lawsuit on behalf of the Owners' Associations listed on Exhibit N.  This exhibit contains information to the best of Marriott Vacations Worldwide's current knowledge, but may be amended upon discovery of further information.  Marriott Vacations Worldwide accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, Marriott Vacations Worldwide has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.

Marriott Vacations Worldwide has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

62.    Plaintiff Mountain Standard Group, LLC is a Wyoming limited liability company headquartered in Jackson, Wyoming.  Yarrow is a management and consulting company focused on providing unique hospitality environments in inspirational locations across the Mountain West.  Yarrow brings this lawsuit on behalf of the properties listed on Exhibit O.  This exhibit contains information to the best of Yarrow's current knowledge, but may be amended upon discovery of further information.  Yarrow accepts both Visa and MasterCard debit and credit cards for payment. Accordingly, Yarrow has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  Yarrow has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

63.    Plaintiff National General Holdings Corp. is a Delaware corporation with its principal place of business in New York, New York.  National General Management Corp. is a Delaware corporation with its principal place of business in New York, New York.  National General is a specialty personal lines insurance company that provides a variety of insurance products, including personal and small business automobile, homeowners, umbrella, and others. National General has approximately 4.1 million property and casualty insurance policyholders, and it is licensed to operate in 50 states and the District of Columbia.  National General accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, National General has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  National General has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

64.    Plaintiff Nespresso USA, Inc. is a Delaware corporation with its principal place of business in New York, New York.  Nespresso sells and distributes coffee capsules, coffee machines, and related accessories for homes, offices, hotels, and restaurants.  Nespresso operates retail stores and sells to customers online.  Nespresso accepts both Visa and MasterCard debit and credit cards for payment. Accordingly, Nespresso has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped. Nespresso has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

65.    Plaintiff Nestle Waters North America Inc. is a Delaware corporation with its principal place of business in Stamford, Connecticut.  Nestle Waters is one of the largest non-alcoholic beverage companies in the United States, with a product portfolio including a variety of quality water brands, such as Perrier, Poland Spring, Arrowhead, S.Pellegrino, and others. Through its direct-to-consumer business, Ready Refresh, serving over 1 million customers, Nestle Waters accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, Nestle Waters has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  Nestle Waters has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

66.    Plaintiff Old Comp. Inc. is a Delaware corporation headquartered in Dallas, Texas. CompUSA was one of the nation's leading consumer electronics, technology products, and computer services retailers.  CompUSA operated over 100 stores and an online retail website.  In late 2007, CompUSA closed the majority of its stores, and the remaining stores were sold. CompUSA accepted both Visa and MasterCard debit and credit cards for payment at its stores and on its website.  Accordingly, CompUSA was forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and

other unlawful conduct throughout the damages period. CompUSA was therefore injured in its business and property as a result of the unlawful conduct alleged herein.

67.    Plaintiff OnStar, LLC is a Delaware corporation with its principal place of business in Detroit, Michigan. OnStar provides a variety of services directly to its customers who own and/or operate millions of vehicles in the United States on a monthly or other subscription basis. OnStar's services include safety, security, and mobility solutions for customers such as automatic crash response, stolen vehicle assistance, roadside assistance, dealer maintenance notifications, hands-free telephone calling, and others. OnStar accepts both Visa and MasterCard debit and credit cards for payment. Accordingly, OnStar has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped. OnStar has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

68.    Plaintiff Pacifica Hotel Management, LLC is a California limited liability company headquartered in Aliso Viejo, California. Pacifica operates 30 focused-service boutique hotels and 4 full-service restaurants. Its portfolio includes properties in California, Hawaii, and Florida. Pacifica manages Hilton and Marriott-branded hotels, among others. Pacifica brings this lawsuit on behalf of the properties listed on Exhibit P. This exhibit contains information to the best of Pacifica's current knowledge, but may be amended upon discovery of further information. Pacifica accepts both Visa and MasterCard debit and credit cards for payment. Accordingly, Pacifica has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped. Pacifica has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

69.    Plaintiff Public Storage is a Maryland corporation with its principal place of business in Glendale, California. Public Storage is the largest brand of self-storage services in the

United States.  There are approximately 2,429 Public Storage facilities across 38 states.
Additionally, Public Storage reinsures policies against losses to goods stored by its customers at
Public Storage facilities and sells merchandise at its facilities.  Public Storage accepts both Visa
and MasterCard debit and credit cards for payment.  Accordingly, Public Storage has been forced
to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants'
unlawful Competitive Restraints and other unlawful conduct throughout the damages period and
will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.
Public Storage has therefore been injured, and continues to be injured, in its business and property
as a result of the unlawful conduct alleged herein.

70.     Plaintiff Qdoba Restaurant Corporation is a Colorado Corporation with its
principal place of business in San Diego, California.  Qdoba operates and franchises fast casual
restaurants that serve Mexican cuisine.  It operates or franchises approximately 750 restaurants in
46 states and the District of Columbia.  Qdoba accepts both Visa and MasterCard debit and credit
cards for payment at its restaurants.  Accordingly, Qdoba has been forced to pay Defendants'
supracompetitive interchange fees and has suffered the effects of Defendants' unlawful
Competitive Restraints and other unlawful conduct throughout the damages period and will
continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.
Qdoba has therefore been injured, and continues to be injured, in its business and property as a
result of the unlawful conduct alleged herein.  Qdoba seeks recovery for the restaurants that it
owned and operated at any time during the relevant period, as set forth and listed on Exhibit Q.
This exhibit contains information to the best of Qdoba's current knowledge, but may be amended
upon discovery of further information.

71.     Plaintiff Sage Hospitality Resources LLC is a Delaware limited liability company
headquartered in Denver, Colorado.  Plaintiff Sage Investment Holdings, L.L.C. is a Delaware
limited liability company headquartered in Denver, Colorado.  Sage is a leading hotel
management and development company, operating through direct or indirect subsidiaries or
affiliates, hotels and restaurants in 15 states and Washington, D.C., including Hilton, Hyatt, and
Marriott-branded hotels, among others.  Sage accepts (or its subsidiaries or affiliates accept) on

behalf of the owners of such hotels and restaurants, both Visa and MasterCard debit and credit cards for payment.  Sage brings this lawsuit on behalf of itself, its subsidiaries and affiliates, the properties listed on Exhibit R, and the owners thereof.  This exhibit contains information to the best of Sage's current knowledge, but may be amended upon discovery of further information.  Accordingly, Sage and/or its subsidiaries or affiliates, in the capacity as manager of such properties, has been forced to pay (on behalf of such properties and the owners thereof) Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  Sage, in such capacity and on behalf of such properties and the respective owners thereof, has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

72.    Plaintiff Sephora USA, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.  Sephora is a leader in global prestige retail, owning and operating a chain of perfume and cosmetics stores in North America.  Sephora offers makeup products, skin care products, fragrances, hair care products, bath and body products, nail products, professional tools and brushes, men's products, gifts, and also provides beauty classes and services.  Sephora has over 450 stand-alone locations in North America and over 660 additional locations within J.C. Penney department stores.  Sephora accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, Sephora has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped. Sephora has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

73.    Plaintiff Sunstone Hotel Investors, Inc. is a Maryland corporation headquartered in Irvine, California.  Sunstone is a real estate investment trust that acquires, owns, asset manages, and renovates hotels, primarily in the upper-scale segment.  Its portfolio includes 21 properties in

8 states and Washington, D.C.  Sunstone owns Hilton, Hyatt, and Marriott-branded hotels, among others.  Sunstone brings this lawsuit on behalf of the properties listed on Exhibit S.  This exhibit contains information to the best of Sunstone's current knowledge, but may be amended upon discovery of further information.  Sunstone accepts both Visa and MasterCard debit and credit cards for payment. Accordingly, Sunstone has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  Sunstone has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

74.    Plaintiff United Airlines, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.  United transports people and cargo through its mainline and regional operations.  United has the world's most comprehensive route network, including U.S. mainland hubs in Chicago, Denver, Houston, Los Angeles, New York/Newark, San Francisco, and Washington, D.C.  United and its regional carriers operate more than 4,900 flights a day to 356 airports across five continents.  United accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, United has been forced to pay Defendants' supracompetitive interchange fees and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful conduct throughout the damages period and will continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.  United has therefore been injured, and continues to be injured, in its business and property as a result of the unlawful conduct alleged herein.

75.    Plaintiff UnitedHealth Group Incorporated is a Delaware corporation with its principal place of business in Minnetonka, Minnesota.  UnitedHealth is a diversified health care company with two distinct business platforms:  health benefits operating under UnitedHealthcare and health services operating under Optum.  Through UnitedHealthcare and Optum, UnitedHealth processed more than three-quarters of a trillion dollars in gross billed charges and managed more than $250 billion in aggregate health care spending on behalf of customers and consumers in

2018.  UnitedHealth accepts both Visa and MasterCard debit and credit cards for payment.

Accordingly, UnitedHealth has been forced to pay Defendants' supracompetitive interchange fees

and has suffered the effects of Defendants' unlawful Competitive Restraints and other unlawful

conduct throughout the damages period and will continue to be subjected to such harm until

Defendants' anticompetitive conduct is stopped.  UnitedHealth has therefore been injured, and

continues to be injured, in its business and property as a result of the unlawful conduct alleged

herein.

76.     Plaintiff White Lodging Services Corporation is an Indiana corporation

headquartered in Merrillville, Indiana.  White Lodging is one of the largest hospitality companies

in the United States, managing as many as 160 hotels.  White Lodging manages Marriott-branded

hotels, among others.  White Lodging brings this lawsuit on behalf of itself, its subsidiaries and

affiliates, the properties listed on Exhibit T, and the owners thereof.  This exhibit contains

information to the best of White Lodging's current knowledge, but may be amended upon

discovery of further information.  White Lodging accepts both Visa and MasterCard debit and

credit cards for payment.  Accordingly, White Lodging has been forced to pay Defendants'

supracompetitive interchange fees and has suffered the effects of Defendants' unlawful

Competitive Restraints and other unlawful conduct throughout the damages period and will

continue to be subjected to such harm until Defendants' anticompetitive conduct is stopped.

White Lodging has therefore been injured, and continues to be injured, in its business and

property as a result of the unlawful conduct alleged herein.

### ***Defendants***

77.     Until the corporate restructuring and initial public offering described below,

Defendant Visa International Service Association was a non-stock Delaware corporation with its

principal place of business in Foster City, California.  Defendant Visa U.S.A., Inc. was a group-

member of Visa International Service Association and was also a non-stock Delaware

corporation.  Visa U.S.A., Inc.'s members were the financial institutions acting as issuing banks

and acquiring banks in the Visa system.

78.    Defendant Visa Inc. is a Delaware corporation with its principal place of business in Foster City, California.  Defendant Visa Inc. was created through a corporate reorganization in or around October 2007.  Visa U.S.A. Inc.'s affiliate banks were the initial shareholders of Visa Inc.

79.    Defendants Visa Inc., Visa USA, Inc., and Visa International Service Association are referred to collectively as "Visa" in this Complaint.

80.    Defendant MasterCard Incorporated was incorporated as a Delaware stock corporation in May 2001.  Its principal place of business is in Purchase, New York.

81.    Defendant MasterCard International Incorporated was formed in November 1966 as a Delaware membership corporation whose principal or affiliate members were its financial institution issuing banks and acquiring banks.  Prior to the initial public offering described below, MasterCard International Incorporated was the principal operating subsidiary of MasterCard Incorporated.

82.    Defendants MasterCard International Incorporated and MasterCard Incorporated are referred to collectively as "MasterCard" in this Complaint.

## ALLEGATIONS

### *Payment Card Industry In General*

83.    The payment card industry involves two categories of general purpose payment cards: (a) General Purpose Credit Cards, and (b) General Purpose Debit Cards.  As explained below, to the degree, if any, that Plaintiffs are required to allege relevant markets, General Purpose Credit Cards constitute a separate product market from General Purpose Debit Cards.

84.    Card issuers earn income from fees charged on each transaction, as well as interest charged on cardholder account balances.  Through the Competitive Restraints, issuing banks have agreed with one another, and with their respective defendant network, to eliminate competition for the merchants' use of their network services.  Absent the Competitive Restraints, it would be in the issuing bank's interests to bargain with merchants to persuade those merchants to accept and promote customer use of its own cards instead of other issuing banks' cards in order to increase transactions.

85.    Issuing banks offer numerous credit card products, some of which offer features such as cash back rebates, low interest rates, low or no annual fees, and rewards programs tied to usage.  Cards that offer cash back, airline miles, or other usage benefits are often referred to as "rewards cards."  Those rewards cards that offer the highest levels of rewards may be referred to as "premium cards" and include cards such as "Visa Signature Preferred" and "MasterCard World Elite."  Standard or "traditional" credit cards, which do not offer the same array of features to cardholders, include products such as "Visa Traditional" and the "MasterCard Core Value" cards.  Interchange fees for cards offering greater rewards are often much higher than fees for cards offering lesser or no rewards.

86.    Only a fraction of the increase in interchange fees for rewards cards actually goes to paying the benefits of the rewards cards to cardholders.  Visa, MasterCard, and their affiliate banks largely retain the supracompetitive merchant fees that merchants pay.  Plaintiffs and other merchants receive no additional benefits whatsoever from the higher interchange fees on reward and premium cards.  Nevertheless, the Honor All Cards Rules and other restraints prevent merchants from refusing to accept cards with higher interchange fees.

87.    Debit cards are one means for demand deposit account holders to access the money in their accounts.  Pre-paid debit cards allow cardholders to access the funds deposited on the card when it was purchased.  There are two primary forms of authentication in use for debit cards in the United States.  One is signature-based, in which the cardholder's signature is usually (but not always) obtained at the time of the transaction, like with a credit card.  The other is PIN-based, in which the cardholder enters a four-digit PIN into a key pad at the point of sale instead of signing.  Signature-based authentication is far more prone to fraud than PIN-based authentication.

88.    Because debit card transactions promptly withdraw funds from the cardholder's account or from the pre-paid card balance, rather than allowing a grace period before billing and payment, they differ from credit card transactions in their utility to consumers.  These differences underlie the court's determination in *United States v. Visa USA, Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), that credit card transactions comprise a separate product market from debit card transactions.

89.    Before their respective initial public offerings ("IPOs"), Visa and MasterCard adopted rules (the Competitive Restraints) that limited competition for merchant acceptance and agreed with member banks to impose those Competitive Restraints on merchants that accept their respective Visa-branded and MasterCard-branded cards.  Among the Competitive Restraints are the "default" interchange fees that merchants are required to pay each time they accept Visa-branded or MasterCard-branded credit or debit cards.  By requiring merchants to accept every Visa or MasterCard-branded card if they accept any single such card, and by prohibiting merchants from steering customers to less expensive cards or even informing them of this option, the Competitive Restraints effectively insulate the issuing banks from competition and render the "default" interchange fees binding on the merchants.  As a result, Visa, MasterCard, and their respective issuing banks gained significant market power in the payment card markets.  The Competitive Restraints they imposed have eliminated the possibility of competition among issuing banks for merchant acceptance of network services.  These Competitive Restraints have therefore eliminated the development of competitive markets for merchant acceptance of network services among issuing affiliate banks.

90.    Thus, the Competitive Restraints enforced by Visa and MasterCard, and the actions taken in furtherance of them, constituted and continue to constitute combinations, agreements, and conspiracies that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

91.    Between 2006 and 2008, Visa and MasterCard both changed their ownership structures and conducted IPOs in which their member banks partially divested their ownership of the Defendants.  But the restructurings and IPOs did not change the fundamental character of the agreements to fix prices or limit competition.  A large part of the motivation for the restructurings was to avoid antitrust liability by limiting the appearance that Visa and MasterCard were structural conspiracies controlled by competing banks.  As MasterCard's 2006 prospectus for its IPO states, "heightened regulatory scrutiny and legal challenges" underlie the decision to make changes in the ownership structure.  In particular, MasterCard stated that "many of the legal and regulatory challenges we face are in part directed at our current ownership and governance

structure in which our customers—or member financial institutions—own all of our common stock and are involved in our governance by having representatives serve on our global and regional boards of directors."

92.     Nonetheless, although Defendants conducted the IPOs, obtained huge amounts of capital from the public markets, and took steps to restructure their organizations to avoid the appearance of collective action by independent actors, neither Visa, MasterCard, nor any of their affiliate banks took any affirmative steps to withdraw from their agreements to fix prices and eliminate competition.  On the contrary, Visa and MasterCard continued to set "default" interchange fees and enforce the Competitive Restraints for the benefit of themselves and their issuing bank affiliates, and with their affiliate banks, Visa and MasterCard have continued to prevent competition among issuing banks for merchant acceptance of network services.

93.     Even after the IPOs, Visa and its affiliate banks persisted in facilitating and enforcing the horizontal agreements among themselves to continue to adhere to and enforce "default" interchange fees and the Competitive Restraints.  Likewise, MasterCard and its affiliate banks persisted in facilitating and enforcing the horizontal agreements among themselves to continue to adhere to and enforce "default" interchange fees and the Competitive Restraints.   It would be contrary to the independent self-interest of any single issuing bank to adhere to the Competitive Restraints without the agreement of the remaining issuing banks to impose and adhere to those same restraints as well.  Visa and MasterCard, by acting as the managers of their respective combinations and agreements to continue imposing and adhering to the Competitive Restraints, eliminate competition for merchant acceptance among their respective issuing banks. But for the agreements that Visa and MasterCard facilitate and enforce, the affiliate banks would be free to compete with one another for merchant acceptance of the cards they issue and use of their network services.

94.     Each issuing bank is an independently owned and independently managed business pursuing its separate economic interests.  However, as a result of their agreements with each other and combination under Visa and MasterCard, the issuing affiliate banks do not compete for merchant use of network services for the cards they issue.  Instead, both before and

CROWELL & MORING LLP
ATTORNEYS AT LAW

after the Visa and MasterCard IPOs, Visa and MasterCard have exerted authority over a universal set of terms and prices imposed on merchants that accept Visa or MasterCard-branded cards. These terms have the effect of fixing the price of interchange fees and otherwise eliminating competition, and do not vary based on the cards' issuer, the type of card, or the actual costs merchants must pay to accept these cards. By agreeing and adhering to the Competitive Restraints and universal interchange fees, the affiliate banks have deprived merchants and their customers of the benefits of competition through independent decision-making.

## THE ANTICOMPETITIVE CONDUCT

### *The Competitive Restraints*

95.     On behalf of and with the agreement of their affiliate issuing banks, Visa and MasterCard have each adopted and imposed supracompetitive "default" interchange fees and other Competitive Restraints on Plaintiffs and other merchants. Those restraints eliminate competition in the markets for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services. But for the Competitive Restraints, issuing banks would compete with one another by lowering prices, increasing quality, innovating, and/or differentiating their services to ensure that the maximum number of merchants accept their particular credit or debit cards. Competition for merchant acceptance of certain credit and debit cards would lead issuing banks to offer lower interchange fees, better services, and more innovative services and/or products to merchants in an effort to win those merchants' business. As a result, merchants would then offer better and differentiated services and/or products, including lower prices and discounting at the point of sale, to their consumers. Thus, the Competitive Restraints have caused Plaintiffs' cost of acceptance of credit and debit cards to be higher than would prevail in a competitive market, which has caused resulting harm to all of their customers, including Visa and MasterCard cardholders.

96.     **Collective Fixing of Interchange Fees**: Visa and MasterCard set so-called "default" interchange fees on credit card and debit card transactions that merchants must pay to their issuing banks and the card networks. The setting of interchange fees and other Competitive Restraints amounts to price fixing, a *per se* violation of Section 1 of the Sherman Act.

97.     Uniform "default" interchange fees are established collectively by Visa, MasterCard, and their affiliate banks and have the effect of fixing the prices paid by merchants for card acceptance.  In setting the interchange fees that are paid to their affiliate banks and card networks, Visa and MasterCard each acts as the ring-leader and enforcer of its respective combination, setting the price that merchants pay for card acceptance and enforcing the restraints that support and perpetuate its exercise of market power.  In addition to fixing prices within each network, Visa and MasterCard collectively fix interchange fees across networks through communication among affiliate banks, most of whom are affiliates of both card networks and many of whom have, at some time, been represented on the boards of directors of both.  Both Visa and MasterCard have consistently raised interchange fee rates in nearly simultaneous fashion.  Neither network would have an incentive to collectively set their fee increases were there competition among the two networks and their affiliate banks or if the networks and affiliates of both did not know in advance that all affiliate banks of both networks would abide by the Competitive Restraints.  Interchange fees account for the largest portion of merchant costs for accepting payment cards.

98.     The interchange fees fixed by Visa and its affiliate banks, and MasterCard and its affiliate banks, are established without regard to their relative cost advantages and are not the fees that would be charged in a competitive market.  Rather, interchange fees are set at the level that maximizes the profits of the Defendants while maintaining Defendants' market power.  In fact, in the past and in many other countries, payment card networks have managed to be profitable and provide excellent service while charging much lower or no interchange fees.  As an example, until the mid-1990s, PIN debit networks in the U.S. often charged no interchange fee or even paid a reverse interchange fee to merchants for each transaction.  The supracompetitive interchange fees Visa and MasterCard currently charge are tools to reinforce the strength of their conspiracies, enticing issuing banks to issue cards through these networks and thereby maintaining and increasing these networks' market power.

99.     Visa and MasterCard both set interchange fees that purport to be only non-binding "default" rates, but in practice, these "default" rates constitute a *de facto* agreement among

competing banks to use those rates as binding and uniform supracompetitive interchange fees that merchants are forced to pay as a result of Visa and MasterCard's illegal exercise of unlawful agreement.

100.    Acquiring banks that do not ensure that the applicable interchange fee is applied when submitting a transaction for authorization, clearance, and settlement are subject to fines assessed by Visa and MasterCard, or even expulsion.  Thus, in practice, both Visa and MasterCard's rules fix interchange fees, because the Competitive Restraints remove any independent competition among issuing banks in the setting of interchange fees.

101.    Absent the Competitive Restraints, Plaintiffs would be able to negotiate separate interchange fee arrangements with individual issuing banks, and, through this competitive process, would only pay fees for use of network services as determined by competition among the issuing banks.  But in the non-competitive system created by the Visa and MasterCard combinations, Visa and MasterCard establish the "default" interchange fee schedules, eliminating this competition and harming Plaintiffs and depriving their customers of the benefits of competition.

102.    **Honor All Cards Rules**: These rules require that a merchant that accepts any Visa-branded or MasterCard-branded credit card must accept all Visa-branded or MasterCard-branded credit cards, no matter which bank issued the card or the card type.  Similarly, a merchant that accepts Visa or MasterCard-branded debit cards must accept all Visa or MasterCard-branded debit cards, no matter the issuing bank.  Because of the Honor All Cards Rules, Plaintiffs cannot reject any or all of the types of cards issued by any particular issuing bank without declining to accept all cards carrying the same brand.  The effect of the Honor All Cards Rules is to completely eliminate all actual and potential price and non-price competition among issuing banks, harming merchants and consumers alike.  This also has the effect of establishing the "default" interchange rates as binding on all merchants, including Plaintiffs.

103.    **All Outlets Rules**: The All Outlets Rules require merchants that accept Visa-branded or MasterCard-branded payment cards to accept those cards at all of their merchant locations.  A merchant is not permitted to accept the cards at some stores but not others.  These

1  rules stop merchants from gaining the benefits of competition as to the terms of acceptance by

2  location (for example, by region of the country).

3      104.    Before January 27, 2013, the All Outlets Rules required merchants that operated

4  under multiple banners (*e.g.*, trade names or name plates) and that accepted Visa-branded or

5  MasterCard-branded payment cards to accept those cards at all of their banners.  This rule

6  precluded merchants from gaining the benefits of competition as to the terms of acceptance with

7  issuing banks by banner or by locations within a banner.  As a result, Plaintiffs could not indicate

8  that they would terminate acceptance of the cards of a particular issuing bank at some of their

9  banners to promote competition as to fees.

10      105.    Changes that Visa and MasterCard made to their All Outlets Rules implemented

11  after January 27, 2013 do not diminish the anticompetitive effects or the injuries Plaintiffs

12  continue to suffer.  The All Outlets Rules still require that if a merchant elects to accept Visa-

13  branded or MasterCard-branded cards at one of its banners, it must accept all such cards at all

14  locations of that banner.  Merchants also cannot accept the cards of some issuers but not others at

15  a particular location pursuant to the Honor All Cards Rules.  The All Outlets Rules reinforce the

16  Honor All Cards Rule by forcing merchants to accept Visa-branded or MasterCard-branded cards

17  at either all of their locations or at no locations.  Refusing to accept any Visa or MasterCard-

18  branded cards at any location would result in an unacceptable loss of sales.

19      106.    The effect of the All Outlets Rules is to completely eliminate all actual and

20  potential price and non-price competition among issuing banks, harming merchants and

21  consumers alike.  This also has the effect of establishing the "default" interchange rates as

22  binding on all merchants, including Plaintiffs.

23      107.    **No Discount and Anti-Steering Rules**: Under the No Discount Rules, merchants

24  are only allowed to offer discounts to customers who pay in cash, rather than using a payment

25  card.  Anti-Steering Rules include the No Discount and other related rules that prohibit merchants

26  from steering customers to less costly forms of payment.  These rules acted and continue to act to

27  eliminate competition both among Visa and MasterCard issuers and among Visa, MasterCard,

28  and other networks, such as American Express and Discover.  Together, because they eliminate

merchants' ability to steer customers to less costly cards (and, indeed, blind customers to the difference in costs among various cards), the rules remove all incentives other card networks would normally have to try to win market share from Visa and MasterCard and their affiliate banks by undercutting Defendants' supracompetitive interchange fees or by providing better service and products. Visa and MasterCard could not afford to fix interchange fees and their affiliates could not afford to abide by the "default" fees and Competitive Restraints were it not for the protection from competing payment networks afforded by the Anti-Steering Rules and other related rules.

108.    As of July 20, 2011, and pursuant to a settlement with the United States Department of Justice, Visa and MasterCard changed their rules to allow merchants to offer discounts to consumers in some limited circumstances. These changes to the No Discount Rules have not diminished the anticompetitive effects of the Competitive Restraints. Despite allowing merchants more discounting options, merchants are still prohibited from offering discounts to consumers for using cards issued by particular issuing banks. The changes to the No Discount Rules have therefore not increased competition among issuing banks for merchant acceptance or to lower interchange fees. A merchant's ability to offer issuer-specific discounts would be an important tool for gaining the benefits of competition as to the terms of acceptance with an issuing bank. Moreover, the networks' past and present prohibitions on discounting and other forms of inter-issuer and inter-brand steering have deprived cardholders and other consumers of discounts they might otherwise receive and of the lower retail prices they could expect were merchants such as Plaintiffs able to lower payment card acceptance costs by inducing competition among issuers and networks.

109.    The effect of the No Discount and Anti-Steering Rules is to completely eliminate all actual and potential price and non-price competition among issuing banks, harming merchants and consumers alike. This also has the effect of establishing the "default" interchange rates as binding on all merchants, including Plaintiffs.

110.    **No Surcharge Rules**: The No Surcharge Rules prohibit Plaintiffs from surcharging transactions in which a consumer uses a Visa-branded or MasterCard-branded card.

Absent these anticompetitive rules, a merchant could, for example, surcharge a transaction in which a consumer uses a premium rewards card that comes with a higher interchange fee than other cards. Thus, these rules eliminate a merchant's incentive and ability to use surcharging as a tool to communicate the true cost of certain cards to consumers and gain the benefits of competition as to the terms of acceptance with an issuing bank. As of January 27, 2013, Visa and MasterCard altered their No Surcharge Rules to permit merchants to surcharge credit card customers under limited circumstances. Debit card transactions still may not be surcharged under the rule modification. Changes to the No Surcharge Rules for credit cards implemented after January 27, 2013 have not eliminated the anticompetitive effects or the injuries Plaintiffs continue to suffer. Even as modified, the No Surcharge Rules prohibit a merchant from surcharging based on the identity of the card issuer. Moreover, the rules allow merchants to surcharge only if other payment networks allow surcharging. Because American Express does not allow surcharging, the narrow exception in Visa and MasterCard's rules has no practical effect for any merchant that accepts American Express, a number that accounts for roughly 90% of U.S. transaction volume.

111.    The effect of the No Surcharge Rules is to completely eliminate all actual and potential price and non-price competition among issuing banks, harming merchants and consumers alike. This also has the effect of establishing the "default" interchange rates as binding on all merchants, including Plaintiffs.

112.    The above Competitive Restraints, individually and in combination, as well as a variety of other rules and regulations enforced by Visa and MasterCard and their affiliate banks, restrain issuing banks from competing for merchant acceptance of network services, thereby eliminating all competition for network services. Absent these rules, the markets for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services would be competitive, resulting in lower interchange fees and better and more innovative products and services for both cardholders and merchants. Plaintiffs would benefit from this competition by paying lower fees and enjoying other more favorable terms for accepting and/or promoting use of an issuing bank's cards. As a result, Plaintiffs and other merchants' costs would fall, enabling lower prices for consumers, including Visa and MasterCard cardholders. Superior card and

network products, such as chip-and-PIN authentication, would provide increased security and other benefits to both cardholders and merchants.

113.    The Competitive Restraints and the collective setting of interchange fees are not reasonably necessary to accomplish any legitimate efficiency-generating objectives.  Further, there are numerous alternative means that are less harmful to competition by which any such objectives could be reasonably accomplished.  The effect of the Competitive Restraints is to completely eliminate actual and potential price and non-price competition among issuing banks, harming merchants and consumers alike.

114.    Since their restructurings, although Visa and MasterCard have held themselves out to be "independent companies," they have continued to act in concert with their (largely overlapping) affiliates to use their market power to benefit affiliate banks and themselves alone by adopting practices with the purpose and having the effect of reinforcing their conspiracy and combination.  They have done so by continuing to pursue a business model that eliminates all incentives for competition, deprives consumers of the benefits of choice and competition, and imposes a tax on merchants, cardholders, and the economy at large to gain supracompetitive profits.

### *The Debit Card Market*

115.    At or around the time the damages period began, Visa possessed monopoly power in the market for General Purpose Debit Card Network Services, as is evidenced by its conduct, the structural characteristics of the market, and its market share, as well as other direct and circumstantial evidence.  Visa and its affiliate banks engaged in additional conduct to impede and exclude competition with the purpose and effect of conferring and maintaining Visa's monopoly power in the market for General Purpose Debit Card Network Services.  As set forth more fully below, this included exclusive agreements between Visa and issuing banks of Visa General Purpose Debit Cards and the imposition of fixed network fees to blunt competition in the market for General Purpose Debit Card Network Services.  These exclusionary acts have suppressed and continue to suppress competition in the market for General Purpose Debit Card Network Services, and thereby have enabled Visa and its affiliate banks to charge supracompetitive

COMPLAINT; DEMAND FOR JURY TRIAL; CASE NO. 19-4188

1  interchange fees and Visa to charge higher network fees than they otherwise would have been

2  able to charge to merchants.

3  116.    Visa's monopoly power in the market for General Purpose Debit Card Network

4  Services is protected by high barriers to entry and network effects, which Visa seeks to maintain

5  and reinforce by its conduct.  To be a viable payment network competitor, a potential entrant

6  would need both (a) widespread, if not ubiquitous, merchant acceptance, and (b) large-scale

7  distribution to consumers through issuing banks.  While each poses a formidable barrier in its

8  own right, the economic reality is that a new entrant must clear both barriers simultaneously.

9  Merchants are generally unwilling to accept a payment card brand that is carried by few

10  cardholders, and cardholders are generally unwilling to carry a payment card brand that is not

11  widely accepted by merchants.  Therefore, starting a new network, whether debit or credit, with

12  sufficient scale to challenge Visa or MasterCard is extremely difficult.  These high barriers to

13  entry, coupled with the entrenched dominance of Visa and MasterCard, explain in large part why

14  no meaningful entry has occurred in the General Purpose Debit Card (and Credit Card) Network

15  Services markets since Discover entered three decades ago in 1985.

16  117.    In addition to its anticompetitive conduct and the structural characteristics of the

17  market for General Purpose Debit Card Network Services, Visa's market share further evidences

18  Visa's monopoly power in this market.  At or around the time the damages period began, Visa's

19  share of the market for General Purpose Debit Card Network Services was approximately 60%, as

20  it comprised 80% of the signature debit card segment and was increasing its PIN debit card share

21  through agreements with the largest issuing banks of General Purpose Debit Cards.  By early

22  2004, Visa had entered into long-term exclusive agreements with most of its large issuing banks

23  that "prevent[ed] Visa banks from switching to MasterCard" which, at the time, was the only

24  other signature debit card network.  *United States v. Visa U.S.A. Inc.*, No. 98-cv-7076(BSJ), 2007

25  WL 1741885, at *2 (S.D.N.Y. June 15, 2007).  Accordingly, Visa "essentially lock[ed] up 89% of

26  the volume of its top 100 debit Issuers." *Id.* at *1.  Those deals and the installed base of Visa and

27  Interlink-branded General Purpose Debit Cards enabled Visa to maintain its monopoly power

28

even after it was forced to relinquish the tying rule by the antitrust settlements in the *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238(JG) (E.D.N.Y.).

118.    By 2005, Visa's Interlink became the leading PIN debit card network with 36% of that segment of the market for General Purpose Debit Card Network Services. Visa maintained that position in PIN debit, along with its dominant position in signature debit, through various exclusive deals with debit issuing banks.  These deals, entered on exclusive or near-exclusive terms, made Visa's Interlink the exclusive or primary PIN debit card acceptance mark on well over 100 million debit cards.  These deals gave Visa the power to raise Interlink's interchange fees because, even if a merchant tried to drop Interlink and its high rates, the merchant would pay more as transactions defaulted to the still pricier Visa signature debit card rates.  There were no other options on many Visa General Purpose Debit Cards.  This exclusivity on many such cards remained intact until April 2012, when Federal Reserve regulations mandated that General Purpose Debit Card issuing banks add a competing network's functionality on their debit cards.

119.    As Visa continued to drive up Interlink interchange fees, the competing PIN debit card networks were forced to raise their rates to compensate for declining volume in a market that had long been dominated by Visa.  The result was the convergence of PIN debit card and signature debit card rates at high *ad valorem* prices, a trend that contributed significantly to the suppression of PIN debit card acceptance in the United States, a longstanding Visa objective. With signature debit card and PIN debit card interchange fees coming into alignment, merchant willingness to install PIN pads to accept PIN debit cards was materially reduced.  Because of Visa's exercise of its monopoly power, merchants were forced to pay market-wide effective interchange fee increases of an estimated 234% between 1998 and 2006.

120.    By 2010, when Congress passed the Durbin Amendment, Visa's power in the market for General Purpose Debit Card Network Services was evidenced by the higher interchange fees associated with signature debit than PIN debit resulting from and bolstered by Visa's exclusive (signature and/or PIN debit) agreements with many of the largest debit issuing banks.

121.    The Durbin Amendment threatened both for two reasons.  First, the regulations capped General Purpose Debit Card interchange fees for large banks, and the cap did not distinguish between signature debit card interchange fees and PIN debit card interchange fees. Second, the Durbin Amendment repealed Visa's exclusive deals with issuing banks by requiring that all General Purpose Debit Cards allow transaction processing over an unaffiliated network. That requirement subjected Visa to potential competition to reduce interchange fees and network fees to win merchant routing decisions.  Many commentators observed that Visa could lose significant portions of its transaction volume, and at least one concluded that up to 80% of its PIN debit volume was at risk.

122.    Visa responded by implementing a fixed fee known as the Fixed Acquirer Network Fee ("FANF") effective April 2012, which applies to the acceptance of Visa-branded products and is based on the size and number of the merchant's locations.  The FANF is effectively a fee merchants must pay to be a part of the Visa network.  This new fee is nothing more than a creative and anticompetitive mechanism for penalizing merchants for routing debit transactions over any rival debit network.

123.    If a merchant accepts any Visa general purpose payment card transactions, credit or debit, the merchant must pay this fixed fee to "access" Visa's networks and, perversely, the more locations the merchant operates, the greater the fee it has to pay.  This construct restores the tie between General Purpose Debit Card acceptance and General Purpose Credit Card acceptance that Visa previously utilized as the linchpin of its strategy to dominate the General Purpose Debit Card Network Services market.  The only way merchants can avoid the fee is to drop all Visa products (which merchants can never do because of an unacceptable loss of sales), and the only way merchants can mitigate the fee is to route their General Purpose Debit Card volume to Visa.

124.    The FANF further penalizes a merchant for routing a transaction over a competing PIN debit network.  If the merchant did this, then it would not be able to reduce its fixed fee by shifting volume from Visa.  In fact, because the merchant must pay Visa's fixed fee whether it routes the transaction to Visa or not, the merchant will, in effect, pay twice for transactions routed over competing PIN debit networks — an up-front payment to Visa simply to be a part of the

1    Visa network, and a second payment to a competing PIN debit network for any particular

2    transaction not routed to Visa.

3        125.    Visa was able to successfully implement and enforce the FANF only through its

4    monopoly power and exercise thereof.  Visa uses the FANF to maintain its monopoly power by

5    compromising the PIN debit networks' ability to compete and neutralizing the competitive

6    dynamic the Durbin Amendment was intended to introduce.  While Visa leveraged its power in

7    the General Purpose Credit Card Network Services market to distort competition in the General

8    Purpose Debit Card Network Services market with the FANF, the rival PIN debit networks

9    cannot do that.  If they tried to implement such a fee, merchants would stop accepting their

10    General Purpose Debit Cards.  Visa has maintained its monopoly power not because it has

11    superior General Purpose Debit Card networks, but because it has the power to exclude

12    competition and maintain and impose supracompetitive fixed fees.

13        126.    Visa's conduct severely foreclosed competition from PIN debit card networks and

14    cemented Visa's market power.  As a result of this conduct, Visa's share of the General Purpose

15    Debit Card Network Services market remains monopolistic and is poised to increase.  Visa's

16    ability to impose supracompetitive Fixed Network Access Fees reflects its continuing monopoly

17    power.

18    ***The EMV Migration***

19        127.    In addition to Visa's exclusive deals and imposition of the FANF, Visa and

20    MasterCard have harmed cardholders and merchants in the General Purpose Credit Card Network

21    Services and General Purpose Debit Card Network Services markets by forcing the use of inferior

22    products protected by Defendants' market power and restraints on trade.  One example of this is

23    Visa and MasterCard's perpetuation of their own highly profitable and fraud-prone offerings, and

24    subsequent forced migration to their own proprietary EMV technology.

25        128.    Initially, Visa and MasterCard conspired to block EMV chip technology in order

26    to protect and profit from their own decades old "magnetic stripe" technology and signature

27    authenticated cards.  Throughout the damages period, Visa and MasterCard have acted to keep

28    these inferior products in place in order to maintain their supracompetitive profits that are

tethered to this technology.  Visa and MasterCard's success in forcing merchants and consumers to accept and use technologically-inferior products—including products that Visa and MasterCard knew would increase fraud—is further evidence of their substantial market power.  Visa and MasterCard have also used the cost of fraud to justify their supracompetitive interchange and other fees.

129.    Congress passed the Durbin Amendment in 2010, eliminating the distinction in interchange fees between signature debit transactions and PIN debit transactions.  This effectively imposed a cap on interchange fees for debit card transactions.  Furthermore, competitors began developing their own lines of signature-based payment systems and alternative "PINless" forms of payment, threatening Visa and MasterCard's market power in the General Purpose Credit Card Network Services and General Purpose Debit Card Network Services markets.

130.    Visa and MasterCard changed gears in response.  Through the exercise of their substantial market power, the card networks formulated and executed a plan forcing a mass migration to the EMV platform within a very limited timeframe.  Visa and MasterCard knew this timeframe would not afford enough time for merchants to comply.  Visa and MasterCard enforced this strict deadline by announcing that by October 2015, the card networks would begin shifting liability for fraudulent transactions from the issuing banks onto merchants that did not fully adopt and integrate the new EMV platform.  Visa and MasterCard forced merchants to undertake this massive expenditure of replacing their current point-of-sale hardware and software with new EMV terminals which would cost billions of dollars.  In the scramble and disarray that ensued to meet this deadline, Visa and MasterCard ensured that their own proprietary EMV technology without requiring the use of PIN authentication became the new industry standard.

131.    Visa and MasterCard conspired and executed their scheme by meeting regularly under the auspices of an entity called EMVCo.  EMVCo, however, was a vehicle through which Visa and MasterCard have colluded to maintain their market dominance and to eliminate competition from rival PIN networks by favoring their own less secure signature-based systems and refusing to prioritize PIN authentication.  Visa and MasterCard also organized their conduct by using issuing banks as conduits for relaying strategic information to one another.

132.     During the mass migration to EMV, Visa and MasterCard implemented and forced the industry to adopt their own EMV technology that utilized signature verification.  Even though Visa and MasterCard knew, and still know now, that signature verification is less secure and more fraud prone than chip-and-PIN authorization, Visa and MasterCard profit far more from routing transactions over the signature authentication based networks that they control, which carry higher interchange fees.

133.     Because of Visa and MasterCard's concerted actions, both credit and debit transactions are routed over Visa or MasterCard's inferior signature-based network where a PIN is not required.  These transactions are therefore less secure, more prone to fraud, and Visa and MasterCard continue to maintain market power and increase their profits.  No legitimate business justification or procompetitive reasons exist for Defendants' refusal to implement and promote PIN authentication.  Chip-and-PIN verification is commonly recognized in the industry, and even internally among Visa, MasterCard and their affiliate banks, as the more secure platform. Defendants have nonetheless exercised their market power to force merchants to use Visa and MasterCard's propriety EMV technology with signature-verification over chip-and-PIN technology.  Visa and MasterCard continue to reap supracompetitive profits as a result.

134.     Furthermore, Defendants have gone to great lengths to consolidate their control over the General Purpose Debit Card Network Services market.  For example, when the EMV shift was announced, the industry had prepared and was ready to implement open architecture software within the EMV chip cards which would allow merchants the ability to route their debit transactions through any payment networks, including those of Visa, MasterCard, Discover, or any other PIN debit network.  This would have resulted in vigorous competition within the General Purpose Debit Card Network Services among the various PIN debit networks market to provide these services, and merchants would have had the ability to select among lower cost forms of debit payment processing.

135.     Visa and MasterCard instead conspired and took action to block open architecture technology by imposing their own proprietary EMV technology with inferior signature-based authorization.  In 2013, Visa and MasterCard entered into reciprocal cross-licensing agreements

which promoted and propagated each other's proprietary EMV technologies.  Visa and MasterCard further agreed not to compete with one another's signature-based debit transactions.

136.    With these agreements in place, Visa and MasterCard approached issuing banks and presented their own EMV technologies as complete "solutions" to meet the impending October 2015 liability-shift deadline.  Furthermore, Visa and MasterCard threatened to drop issuing banks from their general purpose payment card networks if the issuing banks did not persuade competing debit networks to abandon open architecture technology.  Issuing banks were forced to comply because they derive significant income from the issuance of Visa and MasterCard-branded general purpose payment cards and cannot afford to lose this volume of business.  By 2014, competing debit networks were forced to license Visa and MasterCard's proprietary EMV technology under pressure from issuing banks.

137.    Under Visa and MasterCard's proprietary EMV technology, customers insert a chip-based debit card into a new terminal and are often offered only Visa's (or only MasterCard's) network as a choice.  In the instances where customers do have multiple options, the options are "Visa debit" (or "MasterCard debit") and "U.S. debit."  Since most consumers do not know what "U.S. debit" is (which is how Visa and MasterCard have opted to display other PIN networks in order to confuse consumers) customers usually pick Visa or MasterCard.  Visa and MasterCard have used consumers' lack of knowledge to circumvent the Durbin Amendment's goal of providing merchants with routing choice.  Visa and MasterCard have further perpetuated their market power by making it difficult for merchants to override this configuration.

138.    Visa's monopoly power in the market for General Purpose Debit Card Network Services, and its exercise of that power thereof, enabled Visa to effectuate these changes.  During the shift to EMV, MasterCard had originally planned to implement its own EMV technology independent of Visa.  MasterCard, however, had a weaker position in the market, and Visa persuaded MasterCard to instead align with Visa's strategy of reciprocal cross-licensing agreements and agreements not to compete with one another's signature debit transactions.  MasterCard agreed because this would allow MasterCard to become the second, unaffiliated

network on Visa General Purpose Debit Cards, enabling MasterCard to gain most of the debit card transactions that were not routed to Visa. Visa's ability and success in aligning MasterCard with its strategy to monopolizing the General Purpose Debit Card Network Service market is direct evidence of Visa's monopoly in this market. Visa's ability to force issuing banks and competing debit networks to adopt its own proprietary and less secure EMV technology is further evidence of Visa's monopoly power in the market for General Purpose Debit Card Network Services.

## **THE RELEVANT MARKETS**

### *The Relevant Product Markets*

139.    The Court need not define any relevant market in this case because Visa and MasterCard's conduct constitutes *per se* unlawful horizontal price fixing and horizontal restraints of trade involving agreement among competitors not to compete. They are presumptively, unreasonably anticompetitive, and that presumption is irrebuttable.

140.    The Court also need not define a relevant market here because the conduct at issue is horizontal and there exists direct evidence of actual adverse effects on competition. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018); *FTC v. Indiana Fed'n of Dentists*, 476 U. S. 447, 460-61 (1986).

141.    However, if this court were to conclude that the horizontal restraints are not *per se* violations and that the direct evidence of adverse effects on competition is insufficient, Plaintiffs allege that the relevant product markets would be the market for General Purpose Credit Card Network Services and the market for General Purpose Debit Card Network Services, or in the alternative, a relevant product market that encompasses (a) both the issuance of General Purpose Credit Cards to cardholders and the provision of credit card network services to merchants, and (b) both the issuance of General Purpose Debit Cards to cardholders and the provision of debit card network services to merchants, respectively.[1]

---

[1] To the extent necessary, all references, both *infra* and *supra*, to the "General Purpose Credit Card Network Services" and "General Purpose Debit Card Network Services," refer to the alternative relevant product markets that encompass (a) both the issuance of General Purpose Credit Cards to cardholders and the provision of credit card network services to merchants, and (Continued...)

CROWELL & MORING LLP
ATTORNEYS AT LAW

COMPLAINT; DEMAND FOR JURY TRIAL; CASE NO. 19-4188

142.   General Purpose Credit Cards and General Purpose Debit Cards are not reasonably interchangeable with each other or with other forms of payment.

143.   General Purpose Credit Card Network Services is a relevant product market.  A credit or charge card is not interchangeable with a debit card or other form of payment.  Many cardholders desire the ability to access a line of credit, defer payment, or obtain other features offered by the credit cards.  Many merchants prefer credit cards to debit cards because they can be used to provide security deposits, for instance for rental cars and hotel rooms, which debit cards cannot as easily provide.  For this reason, Plaintiffs and other merchants cannot discontinue acceptance of credit cards, even in the face of high or increasing interchange fees, without losing sales.  The availability of debit cards or other forms of payment do not constrain the ability of Visa, MasterCard, and their affiliate banks to impose higher charges on merchants for acceptance of credit or charge cards.  In fact, credit card payments have not declined even though interchange fees are lower on debit cards, further showing that credit and debit cards are not in the same relevant market.

144.   General Purpose Debit Card Network Services is also a relevant product market.  Debit cards are not reasonably interchangeable with credit or charge cards or other forms of payment.  Unlike credit and charge cards, debit cards must be linked to a bank account, or prepaid, and do not provide cardholders with a line of credit.  When a debit card is used, the funds are withdrawn from the cardholder's account either the same day or within a few days.  Consumers may pay with debit cards because they desire to pay for a transaction with immediately available funds without using cash or checks, or because they do not qualify for credit or charge cards.  Thus, merchants cannot discontinue acceptance of debit cards, and acceptance of other forms of payment do not constrain the ability of Visa, MasterCard, and their affiliate banks to impose higher charges on merchants for accepting debit cards.

---

(b) both the issuance of General Purpose Debit Cards to cardholders and the provision of debit card network services to merchants, respectively.

145.    Debit cards are also regulated separately and differently from credit and charge cards.  In 2011, pursuant to the Durbin Amendment, the Federal Reserve Board imposed a maximum level for debit card interchange fees charged by large banks.  The legislation did not mandate that the Federal Reserve Board regulate interchange fees charged in connection with credit or charge card transactions.  Even when the Federal Reserve Board significantly reduced the interchange fees on debit transactions, few if any merchants chose to stop accepting Visa credit cards and accept only debit cards instead.  This further establishes that merchant acceptance of debit cards is a market separate from merchant acceptance of credit and charge cards.

146.    Furthermore, General Purpose Credit Card Network Services and General Purpose Debit Card Network Services are not reasonably interchangeable with the issuance of General Purpose Credit Cards to cardholders and the issuance of General Purpose Debit Cards to cardholders, respectively.  The card issuance services defendants provide to cardholders are not reasonably close substitutes for the network services defendants provide to merchants.  For example, a merchant facing an increase in defendants' interchange fees above the competitive level could not avoid these fees by becoming a Visa or MasterCard cardholder instead of a merchant that accepts Visa or MasterCard payment cards.  The relevant product markets are the markets for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services because of this lack of interchangeability between payment card issuance services to cardholders and payment card network services to merchants.

147.    In *American Express*, the Second Circuit explicitly distinguished its earlier decision in *Visa* where the court had found that, as Plaintiffs allege here, the relevant markets for network services and issuance of general purpose credit cards were distinct.  *See United States v. Am. Express Co.,* 838 F.3d 179, 198 (2d Cir. 2016) ("The relevant market in this case is not the same as the relevant market in *Visa*.") (citing *United States v. Visa U.S.A., Inc*., 344 F.3d 229 (2d Cir. 2003).  As the Second Circuit also held, the relevant markets in *Visa* were rightfully viewed as distinct because the horizontal restraints at issue there, as is also true of the markets in this case, were markedly different from the vertical restraints at issue in *American Express*.  *See id.* Relying on long-standing antitrust law, the U.S. Supreme Court affirmed that a court need not

CROWELL & MORING LLP
ATTORNEYS AT LAW

1   define a relevant market where the conduct at issue concerns horizontal restraints involving

2   agreement among competitors not to compete (which is the case here) as opposed to vertical

3   restraints that were at issue in *American Express.  See Ohio v. Am. Express Co.*, 138 S. Ct. 2274,

4   2285 n.7 (2018).  Visa and MasterCard's IPOs did not effectuate a change in the horizontal

5   character of Defendants' Competitive Restraints and did not alter the substance of the

6   Competitive Restraints, which remain intact today.  Visa and its affiliate banks have, post-IPO,

7   persisted in facilitating and enforcing horizontal agreements among themselves to continue to

8   adhere to and enforce "default" interchange fees and the Competitive Restraints.  Likewise,

9   MasterCard and its affiliate banks have, post-IPO, persisted in facilitating and enforcing

10  horizontal agreements among themselves to continue to adhere to and enforce "default"

11  interchange fees and the Competitive Restraints.

12  ***The Relevant Geographic Markets***

13        148.    The relevant geographic market for the General Purpose Credit Card Network

14  Services market is the United States and its territories.

15        149.    The relevant geographic market for the General Purpose Debit Card Network

16  Services market is the United States and its territories.

17        150.    The "default" interchange fees are set by Visa and MasterCard on a national basis.

18  Similarly, the Competitive Restraints are specific to the United States and its territories.

19        151.    Plaintiffs operate throughout the United States.  The Competitive Restraints

20  imposed on them require that all of their outlets throughout the United States accept all cards of

21  all issuing banks that are affiliates of Visa or MasterCard at "default" interchange fees.

22        152.    Visa and MasterCard, and many of their issuing banks, advertise nationally and

23  pursue promotional strategies aimed at the United States as a whole.

24                                   **MARKET POWER**

25        153.    Visa and its issuing banks have market power in the relevant markets for General

26  Purpose Credit Card Network Services and General Purpose Debit Card Network Services in the

27  United States and its territories.

28

154.    Courts have previously found that Visa had market power in the market for credit card network services with between 43% and 47% of the market and high barriers to entering the relevant product market.  Visa's market share has since risen to 50% in 2016.

155.    Visa's conduct is also direct evidence of its market power and that of its issuing banks.  Interchange fees are set by Visa and its affiliate banks on behalf of its issuing banks.  Visa promulgates and enforces the Competitive Restraints, which are agreed upon by its affiliate banks and prevent competition among its issuing banks for merchant acceptance.  Absent the Competitive Restraints, Visa's credit card issuing banks would be able to compete as to the terms of merchant acceptance, including interchange fees, and Plaintiffs would benefit through lower interchange fees and other benefits from competition.

156.    Visa's ability to maintain "default" credit interchange fees agreed upon by its affiliate banks demonstrates Visa's market power.  Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have fallen for its affiliate banks and even as interchange fees for debit cards have fallen.  Despite these increases, merchants have not stopped accepting Visa-branded credit cards.  Visa's ability to discriminate in price among merchants by distinguishing merchants by size and retail category and by differentiating transactions by size and cards by type, in conjunction with the characteristics of the market and Visa's other conduct, is further evidence of Visa's market power in the General Purpose Credit Card Network Services market.

157.    Visa's market power in the General Purpose Credit Card Network Services market is also demonstrated by the fact that, when the Federal Reserve Board significantly reduced the interchange fees on debit transactions, few if any merchants chose to stop accepting Visa credit cards and accept only debit cards instead.  Nor did Visa reduce its credit card interchange fees to more closely match the regulated interchange fees established for debit cards.  In 2012, the first full year after implementation of the reduced interchange fees on debit transactions, Visa credit card transactions and purchase volume increased.

158.    Competition with MasterCard does not eliminate Visa's exercise of market power in the market for General Purpose Credit Card Network Services.  Before their respective IPOs,

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT; DEMAND FOR JURY TRIAL;
CASE NO. 19-4188

Visa and MasterCard adopted rules that limited competition for merchant acceptance of network services.  After their respective IPOs, Visa and MasterCard's membership, rules, and their power to obtain high interchange fees from merchants have not changed and continue to constrain competition among and between Visa, MasterCard, and the affiliate banks of both combinations. The similarities between Visa and MasterCard's Competitive Restraints and interchange fees are more than simply coincidental parallel behavior.  The affiliates of both networks overlap substantially, and the same banks have often been represented at some time on both Defendants' boards of directors.  The affiliates and leadership of both Defendants are intimately familiar with the workings of the other and collectively set and enforce rules and fees in line with each other. Absent such collusion, each network would seek to compete with the other through lower fees and/or better service.  In fact, though, the services provided by Visa and MasterCard are practically indistinguishable and their fees consistently remain aligned, with similar fee structures, and synchronized fee increases.

159.    MasterCard and its issuing banks have market power in the market for General Purpose Credit Card Network Services in the United States.

160.    Courts have found MasterCard's market share to be sufficient to demonstrate market power in the markets for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.

161.    MasterCard's conduct is direct evidence of its market power and that of its issuing banks.  Interchange fees are set by MasterCard and its affiliate banks on behalf of its issuing banks.  MasterCard promulgates and enforces the Competitive Restraints, which are agreed upon by its affiliate banks and prevent competition among its issuing banks for merchant acceptance. Absent the Competitive Restraints, MasterCard's credit card issuing banks would be able to compete as to the terms of merchant use of their network services, including interchange fees, and Plaintiffs would benefit through lower interchange fees and other benefits from competition.

162.    MasterCard's ability to maintain "default" credit interchange fees agreed upon by its affiliate banks demonstrates its market power.  Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have fallen for its affiliate banks and even

as interchange fees for debit cards have fallen.  Despite these increases, merchants have not stopped accepting MasterCard-branded credit cards.  Further, MasterCard's market power is demonstrated by its ability to discriminate in price among merchants, by distinguishing merchants by size and retail category, and by differentiating transactions by size and cards by type.

163.    Competition with Visa does not eliminate MasterCard's exercise of market power in the market for General Purpose Credit Card Network Services, as set forth more fully above.  Before their respective IPOs, Visa and MasterCard  adopted rules that limited competition for merchant acceptance.  After their respective IPOs, Visa and MasterCard's membership, rules, and their power to obtain high interchange fees from merchants have not changed and continue to constrain competition among and between Visa, MasterCard, and the affiliates of both combinations.

164.    There are also significant barriers to entry into the market to provide General Purpose Credit Card Network Services, as corroborated by the court in *Visa USA, Inc.*, 163 F. Supp. 2d at 341.  Visa's former CEO described starting a new card network as a "monumental" task involving expenditures and investment of over $1 billion.  Both AT&T and Citibank conducted entry analyses, but decided it would be unprofitable to attempt to start a competing General Purpose Credit Card business.

165.    The difficulties associated with entering the credit card market are exemplified by the fact that no company has entered since Discover did so in 1985.  Discover has never achieved more than a 7% share of the General Purpose Credit Card Network Services market and its current share is approximately 4%.

166.    The General Purpose Debit Card Network Services market is also dominated by Visa and MasterCard.  Combined, Visa and MasterCard comprised about 75% of all debit purchase volume in 2004 and comprise over 80% today.  Only Visa, MasterCard, and Discover allow signature authorization of debit transactions.  Visa alone has a 56% share in the General Purpose Debit Card Network Services market.

167.    Visa and MasterCard, together with their issuing banks, each exercise market power in the market for General Purpose Debit Card Network Services.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-60-

168.    Visa participates in and manages a combination comprised of the vast majority of issuing banks of debit cards, such that merchants are unable to refuse to accept Visa-branded debit cards.  This combination of issuing banks, combined with the Competitive Restraints, gives Visa market power.  Visa has exercised and continues to exercise market power by requiring Plaintiffs and other merchants to pay supracompetitive interchange fees and has acquired and maintained that power by imposing the Competitive Restraints.

169.    Visa's market power in the relevant market is demonstrated by the fact that when Visa no longer required merchants to accept its debit cards as a condition of accepting Visa credit cards in 2003, there is no evidence that merchants were able to stop accepting Visa debit cards or to reroute debit transactions to alternative networks despite the availability of lower cost PIN debit networks.  In addition, in 2011, the Federal Reserve Board found that Visa's debit interchange rates were significantly above cost.  Because of Visa's Competitive Restraints, merchants like Plaintiffs cannot gain the benefits of competition among issuing banks for terms of debit card acceptance.

170.    MasterCard participates in and manages a combination comprised of a significant fraction of all issuers of debit cards, such that merchants are unable to refuse to accept MasterCard-branded debit cards.  This combination of issuing banks, combined with the Competitive Restraints, gives MasterCard market power.  MasterCard has exercised and continues to exercise market power by requiring Plaintiffs to pay supracompetitive interchange fees and by imposing the Competitive Restraints.

171.    MasterCard's market power over merchants is demonstrated by the fact that, when the tying arrangement forcing merchants to accept MasterCard debit cards as a condition of accepting MasterCard credit cards was dropped in 2003, few or no merchants stopped accepting MasterCard debit cards or rerouted debit transactions over alternative networks despite the availability of lower cost PIN debit networks.  In addition, in 2011, the Federal Reserve Board found that MasterCard's debit interchange rates were significantly above cost.  Because of MasterCard's Competitive Restraints, merchants like Plaintiffs cannot gain the benefits of competition among issuing banks for terms of debit card acceptance.

172.    Visa and MasterCard's ability to force merchants and consumers to use inferior, fraud-prone products is further evidence of their market power in the General Purpose Credit Card Network Services and Debit Card Network Services markets.  Visa and MasterCard protected their supracompetitive profits by imposing outdated magnetic stripe technology and fraud-prone signature-based authentication.  Visa and MasterCard's ability to later shift fraud liability onto the merchants and force a mass migration to its own proprietary EMV chip platform without PIN verification is further evidence of their market power.

173.    In addition, Visa's ability to enter into exclusive deals with debit card issuing banks, its imposition of the FANF, and its ability to persuade MasterCard to align with Visa's EMV strategy of reciprocal cross-licensing agreements and agreements not to compete with one another's signature debit transactions, are also direct evidence of Visa's monopoly power in the market for General Purpose Debit Card Network Services.  Visa alone has a 56% share in the General Purpose Debit Card Network Services market, constituting further evidence of its monopoly power in the relevant market.

174.    Plaintiffs allege in the alternative that there may also be relevant product markets that encompass (a) both the issuance of General Purpose Credit Cards to cardholders and the provisions of credit card network services to merchants, and (b) both the issuance of General Purpose Debit Cards to cardholders and the provision of debit card network services to merchants.  Even so, Visa and MasterCard hold and exercise substantial market power in these markets.  Visa and MasterCard together account for over 70% of credit card transactions.  Visa and MasterCard comprise about 75% of all debit purchase volume in 2004 and comprise over 80% today.  This market share and resulting cardholder penetration, combined with the significant barriers to entry in the payment card industry, give Visa and MasterCard the power to control prices and exclude competition across their payment card platforms.  Visa and MasterCard's direct ability to raise prices without increasing cardholder rewards or losing merchant acceptance is direct evidence of Defendants' market power in an alternative market encompassing both issuance of payment cards and provision of network services for merchants.  Visa and MasterCard's ability to impose the Competitive Restraints on merchants without losing

1 merchant acceptance or market share is also direct evidence of the Defendants' market power

2 under this alternative market definition.

3 **HARM TO COMPETITION AND TO PLAINTIFFS**

4 175.    Together with their respective affiliate banks, Visa and MasterCard each use their

5 market power to impose supracompetitive collectively fixed interchange fees and the Competitive

6 Restraints on Plaintiffs.

7 176.    The Competitive Restraints facilitate and reinforce the Defendants' ability to

8 maintain these fixed interchange fees and make it impossible for Plaintiffs, other merchants, and

9 consumers to gain the benefits of competition as to the terms of use of General Purpose Credit

10 Card Network Services and General Purpose Debit Card Network Services, including lower

11 interchange fees with individual issuing banks or other card networks.  The Competitive

12 Restraints provide a mechanism for issuing banks to avoid competing for the provision of General

13 Purpose Credit Card Network Services and General Purpose Debit Card Network Services to

14 merchants.  Absent the supracompetitive "default" interchange fees and the other Competitive

15 Restraints, Plaintiffs would be able to gain the benefits of competition as to interchange fees,

16 which would reduce them to a competitive level.  Any changes to the Competitive Restraints

17 resulting from prior settlements and enforcement actions have not eliminated the market power of

18 the combinations and have not curtailed the level or rise in effective interchange fees that

19 merchants have paid.  To the contrary, despite technological advances which have reduced the

20 costs of issuance and processing, interchange and other fees have increased.  Plaintiffs have

21 therefore paid, and continue to pay, interchange fees far in excess of what they would pay in a

22 competitive market, and have suffered additional damages in the form of network fees, fines, and

23 losses from fraud.

24 177.    The Competitive Restraints prevent merchants from informing consumers of the

25 availability of less expensive cards and providing discounts to consumers who use less expensive

26 cards or other less costly means of payment.  This in turn eliminates the incentive of issuing

27 banks to compete for merchant patronage by offering lower fees and improved or enhanced

28 services.

178.    The harm caused to merchants such as Plaintiffs by fixed interchange fees and the Competitive Restraints that facilitate and maintain them have not been offset by cardholder benefits.  Only a small fraction of the increase in interchange fees actually goes to paying the cost of the rewards to cardholders.  The costs of processing payment card transactions have become miniscule, and issuing banks keep most of the interchange revenue as profit rather than distributing the funds to cardholders as rewards.  Given the profitability of cardholder issuance, even if interchange fees were reduced to competitive levels, issuing banks could still fund rewards of equal or greater benefit to cardholders.  Issuing banks could fund these rewards from other sources of revenue derived from cardholder issuance, including, but not limited to, the interest paid on cardholders' account balances, annual fees and charges to cardholders, and penalties for late payment on card balances.  Absent fixed interchange fees and the Competitive Restraints, issuing banks would be forced to compete vigorously for cardholders, which would result in greater cardholder benefits and increased consumer welfare.

179.    Plaintiffs and other merchants have received no benefits from the higher interchange fees on reward and premium cards, and any purported benefits that credit and debit cardholders may receive in the form of "rewards" from issuing banks are far outweighed by the competitive harm inflicted as a result of the default interchange fees and other anticompetitive conduct alleged herein.  Rewards and premium cards do not increase the overall amounts cardholders spend with merchants.  The Honor All Cards Rules and other restraints nevertheless force merchants to accept rewards cards with the highest interchange fees, and further prevent merchants from informing its customers of the availability of lower cost forms of payments and encouraging their use through incentives, such as discounts.

180.    As a result of Defendants' anticompetitive conduct, issuing banks have  agreed not to compete with other issuing banks to provide differentiated products and offerings to cardholders, resulting in higher prices, reduced cardholder choice, reduced product and service quality, and stunted innovation.  Absent Visa and MasterCard's conduct, issuing banks would compete vigorously for cardholders and result in differentiation in their offerings, including

discounts at the point of sale and further investments in higher quality cardholder services and products.

181.    The competitive void created by Defendants also removes any incentive to improve their product and service for both merchants and cardholders.  Defendants have, for example, purposefully forgone adopting more secure transaction authorization technology in order to maximize their own profits while allowing for greater risk of fraud against cardholders and merchants, which in turn results in higher interest rates for cardholders.  That choice would not make rational economic sense in a competitive market place.  Defendants' behavior has harmed cardholders and merchants such as Plaintiffs through the provision of inferior products protected by Defendants' market power and restraints on trade, which in turn reinforce barriers to entry that discourage entry, expansion, and innovation.

182.    Visa has used its monopoly power in the market for General Purpose Debit Card Network Services to enter into exclusive agreements between itself and its affiliate banks, impose the Fixed Acquirer Network Fee, force issuing banks to adopt its proprietary EMV technology, and persuade MasterCard to align with its signature-based debit card strategy.  Visa's exclusionary conduct allowed Visa to charge supracompetitive interchange fees and higher network fees than it otherwise would have been able to charge but for its anticompetitive acts.  Visa's anticompetitive behavior has harmed cardholders and merchants such as Plaintiffs in the market for General Purpose Debit Card Network Services and eliminated competition in the relevant market.

183.    Visa and MasterCard have also blocked the adoption of more secure transaction authorization technology in order to maximize their own profits at the expense of greater risk of fraud against cardholders and merchants.  Defendants' behavior has harmed cardholders and merchants such as Plaintiffs through provision of inferior products protected by Defendants' market power and restraints on trade.  The competitive void created by Defendants also removes any incentive for issuing banks to improve products and services for either merchants or cardholders, stunting innovation and curtailing competition in the relevant markets.

184.    Defendants' anticompetitive conduct during the forced migration to EMV has also caused substantial competitive injury in both the General Purpose Credit Card Network Services and General Purpose Debit Card Network Services markets.  During the EMV shift, Visa and MasterCard conspired and acted together to block the adoption of open architecture technology. They instead imposed their own proprietary EMV technology with fraud-prone signature authorization through agreements not to compete, reciprocal cross-licensing agreements, and threatening to drop issuing banks from issuing their general purpose payment cards.  By eliminating open architecture technology, Visa and MasterCard removed the merchants' ability to shop among the various providers for lower cost forms of debit card processing.  Visa and MasterCard have harmed merchants and cardholders by depriving them of the benefits of competition among the various PIN debit networks that would have vigorously competed to provide this service but for Visa and MasterCard's exclusionary conduct.  Defendants' conduct further caused competitive injury in both the credit and debit card markets through supracompetitive interchange fees based on fraud prone signature-based offerings.

185.    Absent Defendants' anticompetitive conduct, cardholders and merchants such as Plaintiffs would benefit through lower fees and reduced risk of fraud.  The increased amount of both because of Visa and MasterCard's conspiracy are damages due to unlawful behavior.

186.    Throughout the relevant time period and no later than January 1, 2004, Plaintiffs have accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, Plaintiffs have been forced to abide by Visa and MasterCard's unlawful Competitive Restraints, have been forced to pay supracompetitive interchange fees, have suffered increased instances of payment card fraud, and have suffered other related harm.

## TOLLING OF STATUTE OF LIMITATIONS

187.    The statute of limitations has been tolled for all merchants that are putative members of the class action initiated, by information and belief, in *Photos Etc. Corp. v. Visa U.S.A., Inc.*, 3:05-cv-01007-WWE (D. Ct. Jun. 22, 2005).  Because Plaintiffs fall within that class, the statute of limitations has been tolled since at least June 22, 2005.

CROWELL & MORING LLP
ATTORNEYS AT LAW

COMPLAINT; DEMAND FOR JURY TRIAL; CASE NO. 19-4188

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**Visa's Unlawful Horizontal Price Fixing in the Market for General Purpose Credit Card Network Services in Violation of Section 1 of the Sherman Act**

**(Against Visa)**

188.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 187 as if fully rewritten herein.

189.    Visa and its affiliate banks are engaged in concerted action within the meaning of Section 1 of the Sherman Act.  Visa's fixing of interchange fees and its adoption of the Competitive Restraints, as alleged above, constitute horizontal agreements among Visa and its affiliates both prior to and after Visa's reorganization and IPO.  Visa has served and continues to serve as the ringleader of a cartel that fixes prices and otherwise limits competition among the Visa bank affiliates of the combination through the agreed-upon rules governing the credit cards.  Accordingly, by these arrangements, Visa has facilitated and continues to facilitate a horizontal agreement among its affiliates and itself.  Absent this agreement, the affiliates would compete in the market for General Purpose Credit Card Network Services.

190.    Additionally, Visa's rules and related contracts entered into before the Visa IPO constituted a conspiracy or conspiracies to eliminate competition and fix prices from which Visa and its affiliate banks have never withdrawn.  In changing its corporate form at the time of the IPO, Visa did not take any affirmative action to end the conspiracy or its existing anticompetitive arrangements, either by communicating to its affiliates a decision to withdraw from the rules and agreements with its affiliates or by taking any other steps to effectuate withdrawal from the rules and agreements.  Nor did its affiliates take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

191.    Each conspiracy increased and maintained the interchange fees that Plaintiffs and other merchants paid for Visa General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and losses from fraud.  These price

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT; DEMAND FOR JURY TRIAL;
CASE NO. 19-4188

1   increases were the products of the agreement among Visa and its affiliate banks that the banks

2   will not compete in the market for General Purpose Credit Card Network Services.

3         192.   Visa has further engaged in unreasonable horizontal restraints in the market for

4   General Purpose Credit Card Network Services before and during the forced industry migration to

5   EMV technology by imposing its own inferior and fraud-prone offerings such as magnetic strip

6   technology and signature-based authorization instead of the more secure chip-and-PIN

7   verification.  Visa's anticompetitive conduct has had the purpose and effect increasing fraud and

8   supracompetitive interchange fees.

9         193.   The price-fixing conspiracy and related agreements not to compete are *per se*

10  unlawful under Section 1 of the Sherman Act.[2]

11        194.   Even in the event that each price-fixing conspiracy and related agreements are not

12  presumed to be unreasonably anticompetitive and hence *per se* unlawful, they were still

13  unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  As alleged above,

14  Visa and its affiliates have market power in the market for General Purpose Credit Card Network

15  Services and have exercised that market power with anticompetitive effects.  Further, the alleged

16  scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to

17  eliminate its substantial anticompetitive effects.

18        195.   Plaintiffs suffered antitrust injury from these unlawful restraints of trade.

19        196.   As a direct and proximate result of these violations of Section 1 of the Sherman

20  Act throughout the damages period, Plaintiffs have been injured in their business and property in

21  an amount to be determined at trial.

22  ///

23  ///

24  ///

25  ///

26  ─────────────────────

27        [2] This is true whether or not the relevant market is defined as a market that encompasses both the issuance of General Purpose Credit Cards to cardholders and the provision of credit card network services for merchants because competitive harm is presumed.

28

**SECOND CLAIM FOR RELIEF**

**MasterCard's Unlawful Horizontal Price Fixing in the Market for General Purpose Credit Card Network Services in Violation of Section 1 of the Sherman Act**

**(Against MasterCard)**

197.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 196 as if fully rewritten herein.

198.    MasterCard and its affiliate banks are engaged in concerted action within the meaning of Section 1 of the Sherman Act.  MasterCard's fixing of interchange fees and its adoption of the Competitive Restraints, as alleged above, constitute horizontal agreements among MasterCard and its affiliates both prior to and after MasterCard's reorganization and IPO. MasterCard has served and continues to serve as the ringleader of a cartel that fixes prices and otherwise limits competition among the MasterCard bank affiliates of the combination through the agreed-upon rules governing the credit cards.  Accordingly, by these arrangements, MasterCard has facilitated and continues to facilitate a horizontal agreement among its affiliates and itself.  Absent this agreement, the affiliates would compete in the market for General Purpose Credit Card Network Services.

199.    Additionally, MasterCard's rules and related contracts entered into before the MasterCard IPO constituted a conspiracy or conspiracies to eliminate competition and fix prices from which MasterCard and its affiliate banks have never withdrawn.  In changing its corporate form at the time of the IPO, MasterCard did not take any affirmative action to end the conspiracy or its existing anticompetitive arrangements, either by communicating to its affiliates a decision to withdraw from the rules and agreements with its affiliates or by taking any other steps to effectuate withdrawal from the rules and agreements.  Nor did its affiliates take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

200.    Each conspiracy increased and maintained the interchange fees that Plaintiffs and other merchants paid for MasterCard General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, losses from fraud.  These price increases

1    were the products of the agreement among MasterCard and its affiliate banks that the banks will

2    not compete in the market for General Purpose Credit Card Network Services.

3        201.    MasterCard has further engaged in unreasonable horizontal restraints in the market

4    for General Purpose Credit Card Network Services before and during the forced industry

5    migration to EMV technology by imposing its own inferior and fraud-prone offerings such as

6    magnetic strip technology and signature-based authorization instead of the more secure chip-and-

7    PIN verification.  MasterCard's anticompetitive conduct has had the purpose and effect increasing

8    fraud and supracompetitive interchange fees.

9        202.    The price-fixing conspiracy and related agreements not to compete are *per se*

10    unlawful under Section 1 of the Sherman Act.[3]

11        203.    Even in the event that each price-fixing conspiracy and related agreements not

12    presumed to be unreasonably anticompetitive and hence *per se* unlawful,, they were still

13    unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  As alleged above,

14    MasterCard and its affiliates have market power in the market for General Purpose Credit Card

15    Network Services and have exercised that market power with anticompetitive effects.  Further,

16    the alleged scheme served no legitimate business purpose, and achieved no legitimate efficiency

17    benefit to eliminate its substantial anticompetitive effects.

18        204.    Plaintiffs suffered antitrust injury from these unlawful restraints of trade.

19        205.    As a direct and proximate result of these violations of Section 1 of the Sherman

20    Act throughout the damages period, Plaintiffs have been injured in their business and property in

21    an amount to be determined at trial.

22    ///

23    ///

24    ///

25    ///

26    _____

27        [3] This is true whether or not the relevant market is defined as a market that encompasses
both the issuance of General Purpose Credit Cards to cardholders and the provision of credit card
network services for merchants because competitive harm is presumed.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT; DEMAND FOR JURY TRIAL;
CASE NO. 19-4188

1

**THIRD CLAIM FOR RELIEF**

2

**Visa's Unlawful Horizontal Price Fixing in the Market for Debit Card Network Services in Violation of Section 1 of the Sherman Act**

3

4

**(Against Visa)**

5

206.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1

6

through 205 as if fully rewritten herein.

7

207.    Visa and its affiliate banks are engaged in concerted action within the meaning of

8

Section 1 of the Sherman Act.  Visa's Competitive Restraints, as alleged above, constitute

9

horizontal agreements among Visa and its affiliates both prior to and after Visa's reorganization

10

and IPO.  Visa has served and continues to serve as the ringleader of a cartel that fixes prices and

11

otherwise limits competition among the Visa bank affiliates of the combination through the

12

agreed-upon rules governing the debit cards.  Accordingly, by these arrangements, Visa has

13

facilitated and continues to facilitate a horizontal agreement among its affiliates and itself.

14

Absent this agreement, the affiliates would compete in the market for General Purpose Debit Card

15

Network Services.

16

208.    Additionally, Visa's rules and related contracts entered into before the Visa IPO

17

constituted a conspiracy or conspiracies to eliminate competition and fix prices from which Visa

18

and its affiliate banks have never withdrawn.  In changing its corporate form at the time of the

19

IPO, Visa did not take any affirmative action to end the conspiracy or its existing anticompetitive

20

arrangements, either by communicating to its affiliates a decision to withdraw from the rules and

21

agreements with its affiliates or by taking any other steps to effectuate withdrawal from the rules

22

and agreements.  Nor did its affiliates take any steps to withdraw from the rules and agreements

23

or take any other steps to effectuate withdrawal from the rules and agreements.

24

209.    Each conspiracy increased and maintained the interchange fees that Plaintiffs and

25

other merchants paid for Visa General Purpose Debit Card transactions, and it imposed additional

26

damages in the form of network fees, fines, and losses from fraud.  These price increases were the

27

products of the agreement among Visa and its affiliate banks that the banks will not compete in

28

the market for General Purpose Debit Card Network Services.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-71-

COMPLAINT; DEMAND FOR JURY TRIAL;
CASE NO. 19-4188

210.    Visa has further engaged in unreasonable horizontal restraints in the market for General Purpose Debit Card Network Services before and during the forced industry migration to EMV technology by imposing its own inferior and fraud-prone offerings such as magnetic strip technology and signature-based authorization instead of the more secure chip-and-PIN verification.  Visa also entered into exclusive agreements with issuing banks, imposed the FANF on merchants, and entered into reciprocal cross-licensing agreements and agreements not to compete with MasterCard.  Visa's anticompetitive conduct has had the purpose and effect increasing fraud, raising costs, increasing supracompetitive interchange fees, and impeding and excluding other providers of General Purpose Debit Card Network Services.

211.    The price-fixing conspiracy and related agreements not to compete are *per se* unlawful under Section 1 of the Sherman Act.[4]

212.    Even in the event that each price-fixing conspiracy and related agreements are not presumed to be unreasonably anticompetitive and hence *per se* unlawful,, they were still unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  As alleged above, Visa and its affiliates have market power in the market for General Purpose Debit Card Network Services and have exercised that market power with anticompetitive effects.

213.    Plaintiffs suffered antitrust injury from these unlawful restraints of trade.

214.    As a direct and proximate result of these violations of Section 1 of the Sherman Act throughout the damages period, Plaintiffs have been injured in their business and property in an amount to be determined at trial.

///

///

///

///

///

---

[4] This is true whether or not the relevant market is defined as a market that encompasses both the issuance of General Purpose Debit Cards to cardholders and the provision of debit card network services for merchants because competitive harm is presumed.

**FOURTH CLAIM FOR RELIEF**

**MasterCard's Unlawful Horizontal Price Fixing in the Market for Debit Card Network Services in Violation of Section 1 of the Sherman Act**

**(Against MasterCard)**

215.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 214 as if fully rewritten herein.

216.    MasterCard and its affiliate banks are engaged in concerted action within the meaning of Section 1 of the Sherman Act.  MasterCard's fixing of interchange fees and its adoption of the Competitive Restraints, as alleged above, constitute horizontal agreements among MasterCard and its affiliates both prior to and after MasterCard's reorganization and IPO. MasterCard has served and continues to serve as the ringleader of a cartel that fixes prices and otherwise limits competition among the MasterCard bank affiliates of the combination through the agreed-upon rules governing the debit cards.  Accordingly, by these arrangements, MasterCard has facilitated and continues to facilitate a horizontal agreement among its affiliates and itself.  Absent this agreement, the affiliates would compete in the market for General Purpose Debit Card Network Services.

217.    Additionally, MasterCard's rules and related contracts entered into before the MasterCard IPO constituted a conspiracy or conspiracies to eliminate competition and fix prices from which MasterCard and its affiliate banks have never withdrawn.  In changing its corporate form at the time of the IPO, MasterCard did not take any affirmative action to end the conspiracy or its existing anticompetitive arrangements, either by communicating to its affiliates a decision to withdraw from the rules and agreements with its affiliates or by taking any other steps to effectuate withdrawal from the rules and agreements.  Nor did its affiliates take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

218.    Each conspiracy increased and maintained the interchange fees that Plaintiffs and other merchants paid for MasterCard General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and losses from fraud.  These price

increases were the products of the agreement among MasterCard and its affiliate banks that the banks will not compete in the market for General Purpose Debit Card Network Services.

219.    MasterCard has further engaged in unreasonable horizontal restraints in the market for General Purpose Debit Card Network Services before and during the forced industry migration to EMV technology by imposing its own inferior and fraud-prone offerings such as magnetic strip technology and signature-based authorization instead of the more secure chip-and-PIN verification.  MasterCard also entered into reciprocal cross-licensing agreements and agreements not to compete with Visa.  MasterCard's anticompetitive conduct has had the purpose and effect increasing fraud, raising costs, increasing supracompetitive interchange fees, and impeding and excluding other providers of General Purpose Debit Card Network Services.

220.    The price-fixing conspiracy and related agreements not to compete are *per se* unlawful under Section 1 of the Sherman Act.[5]

221.    Even in the event that each price-fixing conspiracy and related agreements are not presumed to be unreasonably anticompetitive and hence *per se* unlawful,, they were still unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  As alleged above, MasterCard and its affiliates have market power in the market for General Purpose Debit Card Network Services and have exercised that market power with anticompetitive effects. Further, the alleged scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to eliminate its substantial anticompetitive effects.

222.    Plaintiffs suffered antitrust injury from these unlawful restraints of trade.

223.    As a direct and proximate result of these violations of Section 1 of the Sherman Act throughout the damages period, Plaintiffs have been injured in their business and property in an amount to be determined at trial.

///

///

---

[5] This is true whether or not the relevant market is defined as a market that encompasses both the issuance of General Purpose Debit Cards to cardholders and the provision of debit card network services for merchants because competitive harm is presumed.

# FIFTH CLAIM FOR RELIEF

**Visa's Monopolization of the General Purpose Debit Card Network Services Market in Violation of Section 2 of the Sherman Act**

**(Against Visa)**

224.  Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 223 as if fully rewritten herein.

225.  Visa possesses monopoly power in the market for General Purpose Debit Card Network Services, as demonstrated by structural characteristics of the market, including barriers to entry, its conduct, its market share, and other direct and circumstantial evidence, including evidence of its actual exercise of that power.

226.  Through the anticompetitive acts set forth above, including Visa's exclusive agreements with issuing banks, imposition of the FANF, and conduct before and during industry migration to EMV technology, including persuading MasterCard to align with its EMV strategy, and given the structural characteristics of the industry which make entry difficult, Visa has unlawfully acquired and is maintaining its monopoly power in the market for General Purpose Debit Card Network Services—not by virtue of any superior products, services, or business acumen.

227.  Visa's conduct has given it power over price and the power to exclude competition in the market for General Purpose Debit Card Network Services.  Visa's anticompetitive conduct has had the purpose and effect of increasing fraud, raising costs, and impeding and excluding other providers of General Purpose Debit Card Network Services.

228.  As a direct and proximate result of Visa's exclusionary conduct, interchange fees and network fees for General Purpose Debit Card Network Services were set at supracompetitive levels and Plaintiffs have suffered injury to their business and property by paying such artificially-inflated, supracompetitive interchange fees and network fees in an amount to be determined at trial. Plaintiffs have suffered antitrust injury from these acts of monopolization.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-75-

COMPLAINT; DEMAND FOR JURY TRIAL;
CASE NO. 19-4188

229.   Visa's unlawful acquisition of monopoly power constituted a violation of Section 2 of the Sherman Act.  Visa's unlawful maintenance of monopoly power constitutes a violation of Section 2 of the Sherman Act, which is ongoing.

## SIXTH CLAIM FOR RELIEF

### Violations of the California Cartwright Act
### (Cal. Bus. & Prof. Code §§ 16700 *et seq.*)

### (Against All Defendants, Individually and Collectively)

230.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 229 as if fully rewritten herein**.**

231.   Visa, MasterCard, and their affiliate banks each have market power in the markets for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.

232.   Visa and its affiliate banks—direct, horizontal competitors of each other—have engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of the Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 *et seq.*).  MasterCard and its affiliate banks—direct, horizontal competitors of each other—have engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of the Cartwright Act.  These unlawful contracts, combinations, and conspiracies were entered into and effectuated within the State of California.

233.   The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's affiliate banks and Visa and between and among MasterCard's affiliate banks and MasterCard, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the interchange fees charged to Plaintiffs and other merchants by issuing banks in the markets for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.

234.   Visa's Board of Directors, which included representatives from several of Visa's affiliate banks, voted to fix, raise, maintain, or stabilize the interchange fees for Visa transactions, in violation of the Cartwright Act.  MasterCard's Board of Directors, which included

1    representatives from several of MasterCard affiliate banks, voted to fix, raise, maintain, or

2    stabilize the interchange fees for MasterCard transactions, in violation of the Cartwright Act.

3        235.    As a direct consequence of the contract, combination, conspiracy, and agreement,

4    actual and potential competition in the markets for General Purpose Credit Card Network

5    Services and General Purpose Debit Card Network Services, was substantially excluded,

6    suppressed, and effectively foreclosed.

7        236.    Visa and MasterCard derived direct and substantial economic benefits from the

8    supracompetitive interchange fees in the markets for General Purpose Credit Card Network

9    Services and General Purpose Debit Card Network Services.

10        237.    But for the anticompetitive conduct of Visa and its affiliate banks and of

11    MasterCard and its affiliate banks, competition among banks would have eliminated or greatly

12    reduced the credit card interchange fees in order to gain business from merchants, including

13    Plaintiffs.

14        238.    The collectively fixed credit and debit card interchange fees are illegal.  It is not

15    necessary to accomplish any procompetitive benefit to the Visa or MasterCard network.  Visa,

16    MasterCard, and their affiliate banks' price fixing achieved few, if any, procompetitive benefits to

17    counterbalance their demonstrated anticompetitive effects in the markets for General Purpose

18    Credit Card Network Services and General Purpose Debit Card Network Services.  Even if some

19    horizontal agreement was necessary to promote the efficiencies of the Visa and MasterCard

20    networks, the collectively-set credit card and debit card interchange fees are significantly more

21    restrictive than necessary to bring about those efficiencies.

22        239.    As a direct and proximate consequence of Visa and MasterCard's anticompetitive

23    conduct, Plaintiffs have suffered injury in its business and property, in an amount to be

24    determined at trial, by having to pay such artificially inflated, supracompetitive interchange fees.

25    Plaintiffs' injury is the type of injury the Cartwright Act and the other antitrust laws were

26    designed to prevent and flows from that which makes Visa, MasterCard, and their affiliate banks'

27    conduct unlawful.

28    ///

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-77-

**SEVENTH CLAIM FOR RELIEF**

**Violations of the California Unfair Competition Law**
**(Cal. Bus. & Prof. Code §§ 17200 *et seq*.)**

**(Against All Defendants, Individually and Collectively)**

240.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 239 as if fully rewritten herein**.**

241.    Visa, MasterCard, and their affiliate banks each have engaged in unlawful, unfair or fraudulent business conduct alleged herein, entered into and/or effectuated within the State of California, in violation of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*

242.    Defendants' conduct alleged above violates, *inter alia*, Sections 1 and/or 2 of the Sherman Act, Section 4 of the Clayton Act, and the Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 *et seq.*) and thus constitutes unlawful conduct under the UCL as well.  The conduct violates California's policy of fostering and encouraging competition by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented.  The acts and practices alleged herein violate the competitive policies underlying the Cartwright Act and have an actual and threatened adverse effect on competition.

243.    Defendants' business conduct is also unfair under the UCL because it threatens at least incipient violations of the antitrust laws or violates the policy or spirit of one of those laws with effects comparable to a violation of such laws or otherwise significantly threatens or harms competition.  Defendants' complained-of conduct is immoral, unethical, oppressive, unscrupulous or substantially injurious to merchants, including Plaintiffs, and to consumers who ultimately bear higher costs resulting from Defendants' anticompetitive and unfair business acts and practices alleged herein.

244.    Defendants' business conduct was also fraudulent under the meaning of the UCL in that it was deceptive.  Defendants claimed that interchange fees were only non-binding, but in practice, these default rates constitute a *de facto* agreement among competing banks to use those

CROWELL
& MORING LLP
ATTORNEYS AT LAW

rates as binding and uniform supracompetitive interchange fees. Defendants have also acted to force merchants and consumers to accept and use technologically-inferior products that they knew would increase fraud. Defendants presented their own EMV technologies as complete solutions and simultaneously shifted fraud liability onto merchants even though this technology was less secure.

245.    As a direct consequence of the contract, combination, conspiracy, and agreement, actual and potential competition in the markets for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services, was substantially excluded, suppressed, and effectively foreclosed.

246.    Visa and MasterCard derived direct and substantial economic benefits from the supracompetitive interchange fees in the markets for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.

247.    But for the anticompetitive conduct of Visa and its affiliate banks and of MasterCard and its affiliate banks, competition among banks would have eliminated or greatly reduced the credit card interchange fees in order to gain business from merchants, including Plaintiffs.

248.    The collectively fixed credit and debit card interchange fees are illegal. It is not necessary to accomplish any procompetitive benefit to the Visa or MasterCard network. Visa, MasterCard, and their affiliate banks' price fixing achieved few, if any, procompetitive benefits to counterbalance their demonstrated anticompetitive effects in the markets for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services. Even if some horizontal agreement was necessary to promote the efficiencies of the Visa and MasterCard networks, the collectively-set credit card and debit card interchange fees are significantly more restrictive than necessary to bring about those efficiencies.

249.    As a direct and proximate consequence of Visa and MasterCard's anticompetitive conduct, Plaintiffs have suffered injury in its business and property, in an amount to be determined at trial, by having to pay such artificially inflated, supracompetitive interchange fees. Plaintiffs' injury is the type of injury the Cartwright Act and the other antitrust laws were

1  designed to prevent and flows from that which makes Visa, MasterCard, and their affiliate banks'

2  conduct unlawful.

3  ## **PRAYER FOR RELIEF**

4  WHEREFORE, Plaintiffs pray for relief and judgment as follows:

5  1.    Judgment in favor of Plaintiffs and against each Defendant, in an amount to be

6  determined at trial including, but not limited to, compensatory damages, trebled damages, and

7  pre-judgment interest, as permitted by law;

8  2.    An injunction ordering Defendants to cease their unlawful anticompetitive

9  conduct; void all unlawful agreements, combinations, and conspiracies in restraint of trade; and

10  refrain from engaging in any other similar conduct or agreements in the future;

11  3.    An award of the cost of the suit, including reasonable attorneys' fees; and

12  4.    Such other and further relief as the Court deems just, equitable, and proper.

13  ## **DEMAND FOR JURY TRIAL**

14  Plaintiffs demand a trial by jury of all issues properly triable thereby.

15

16  Dated:    July 19, 2019    Respectfully Submitted,

17  CROWELL & MORING LLP

18

19  */s/ Daniel A. Sasse*

20  Daniel A. Sasse
   Deborah E. Arbabi
21  John S. Gibson
   Jordan L. Ludwig
22
   *Attorneys for All Plaintiffs*
23

24

25

26

27

28

Crowell
& Moring LLP
Attorneys At Law

-80-

COMPLAINT; DEMAND FOR JURY TRIAL;
CASE NO. 19-4188